JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Hersha Hospitality Management, L.P.

**DEFENDANTS**

The Procaccianti Group, Kimberly Furlong, Erik McDonald

(b) County of Residence of First Listed Plaintiff  Philadelphia
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Providence County, RI
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

David J. Walton, Cozen O'Connor, 1900 Market St., Philadelphia,
PA  19103 (215) 665-2000

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question (U.S. Government Not a Party)

☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 USC § 1332, Pennsylvania Uniform Trade Secret Act, Computer Fraud & Abuse Act, 18 USC 1030

Brief description of cause:  Defendants have violated their employment contracts and misappropriated trade secrets and confidential information.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE  10/17/2011

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 510 Walnut Street, Philadelphia, PA 19106

Address of Defendant: 1140 Reservoir Avenue, Cranston, RI 02920

Place of Accident, Incident or Transaction: 510 Walnut Street, Philadelphia, PA 19106
(Use Reverse Side For Additional Space)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☐ No☒

Does this case involve multidistrict litigation possibilities?    Yes☐ No☒

*RELATED CASE, IF ANY:*

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
Yes☐ No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
Yes☐ No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
Yes☐ No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
Yes☐ No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
(Please specify)

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases
(Please specify)

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, _____, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: _____    _____    _____
Attorney-at-Law    Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: October 17, 2011    _____    86019
Attorney-at-Law    Attorney I.D.#

CIV. 609 (6/08)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

Hersha Hospitality Management, L.P.    :           CIVIL ACTION
:
              v.            :
The Procaccianti Group, Kimberly    :
Furlong, Erik McDonald          :           NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.        ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.        ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                      ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                   ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.   ( x )

| | | |
|---|---|---|
| October 17, 2011 | David J. Walton | Hersha Hospitality Management, L.P. |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-665-2000 | 215-665-2013 | dwalton@cozen.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Hersha Hospitality Management, L.P.<br>510 Walnut Street<br>Philadelphia, PA 19106 | : |
| Plaintiff, | : |
| v. | : |
| The Procaccianti Group<br>1140 Reservoir Avenue<br>Cranston, RI 02920 | : |
| and | : |
| Kimberly Furlong<br>1148 Willow Bend Drive<br>Medina, OH 44256 | : |
| and | : |
| Erik McDonald<br>27 Quail Hollow Drive<br>Sewell, NJ 08080 | : |
| Defendants. | : |

CIVIL ACTION

NO.

## COMPLAINT

Plaintiff, Hersha Hospitality Management, L.P. ("HHM"), by its attorneys, brings the following civil action against Defendants The Procaccianti Group ("TPG"), Kimberly Furlong ("Furlong"), and Erik McDonald ("McDonald") (collectively, "Defendants"), and avers as follows:

## INTRODUCTION

This case presents the Court with claims punctuated by a web of deception.  McDonald and Furlong were two HHM key employees who suddenly resigned from HHM to work for a

competitor, TPG. Before doing so, they recruited key employees – with TPG's inducement – to leave with them en masse. In doing so, McDonald and Furlong clearly violated their contractual and fiduciary duties owed to HHM. When confronted with this evidence, however, both McDonald and Furlong misled HHM about their involvement. HHM's internal investigation reveals that McDonald was the "ring leader." He previously worked for TPG. When he decided to leave HHM, he recruited Furlong to go with him, and then they both recruited two other HHM employees, David Singer and Alan Swerdloff, to leave *en masse*.

Unfortunately, the deception goes even further. McDonald and Furlong also misled HHM about using external USB memory devices on their HHM laptops. In fact, HHM's computer forensic examination reveals that McDonald and Furlong shared a Western Digital 250GB external drive, which Furlong accessed with an unknown computer as late as October 7, 2011. As a result, Furlong and McDonald potentially took thousands of files from HHM, many of which contain HHM's confidential information. HHM is now faced with the real possibility that its direct competitor, TPG, could have access to its most important competitive secrets and strategies. Upon information and belief, TPG has encouraged this conduct by offering the former HHM employees substantial raises in a blatant effort to harm HHM by raiding its top managers and by inducing them to commit wrongs.

This is a case that needs early Court intervention to halt Defendants' unlawful conduct and to help HHM recover its lost information. HHM is seeking damages for the substantial harm that has occurred, and will continue to occur, before Defendants' illegal conduct is enjoined.

## **NATURE OF THE ACTION**

1.    This is an action arising from Defendants' unlawful misappropriation, use, and/or disclosure of HHM's trade secrets and other confidential information in violation of Pennsylvania common law and statutory law, 12 Pa. Cons. Stat. § 5301, *et seq*. This action

further concerns Furlong's violation of 18 U.S.C. § 1030, the Computer Fraud and Abuse Act,

Furlong's and McDonald's breach of their respective confidentiality and non-solicitation

agreements, Furlong's and McDonald's violations of the duty of loyalty, and Defendants'

misappropriation of HHM's corporate and business opportunities.

2.      HHM is seeking to enjoin Defendants' from engaging in further conduct that

would be detrimental to HHM.

3.      HHM is seeking to recover the damages it has suffered and will continue to suffer

as a result of Defendants' unlawful conduct.

## PARTIES AND VENUE

4.      Plaintiff HHM is a corporate entity that is headquartered at 510 Walnut Street, 9th

Floor, Philadelphia, Pennsylvania 19106.

5.      Defendant TPG is a corporate entity that is headquartered at 1140 Reservoir

Avenue, Cranston, Rhode Island 02920.

6.      Defendant Furlong is an adult individual who resides at 1148 Willow Bend Drive,

Medina, Ohio 44256.

7.      Defendant McDonald is an adult individual who resides at 27 Quail Hollow

Drive, Sewell, New Jersey 08080.

8.      Subject matter jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332.

Plaintiff HHM is a corporation with residence in Pennsylvania, the state where it is

headquartered and the state within which it is incorporated.  Defendant McDonald is a resident of

New Jersey.  Defendant Furlong is a resident of Ohio.  Defendant TPG is a corporation with

residence in Rhode Island, the state where it is headquartered and the state within which it is

incorporated.  Accordingly, complete diversity exists among Plaintiff HHM and all Defendants.

The amount in controversy exceeds $75,000.

9.      Subject matter jurisdiction in this Court is also proper pursuant to 28 U.S.C. §
1331, as Count XI arises under 18 U.S.C. § 1030, the Computer Fraud and Abuse Act.  This
Court has supplemental jurisdiction over the remaining counts, which arise under Pennsylvania
state law, pursuant to 28 U.S.C. § 1367(a), as all claims in this matter are related and "form part
of the same case or controversy."

10.      Venue in this forum is appropriate pursuant to 28 U.S.C. §1391(b)(2).  The
majority of acts giving rise to this Complaint occurred in locations encompassed by the Eastern
District of Pennsylvania.

### FACTUAL ALLEGATIONS
### Furlong's and McDonald's Employment with HHM

11.      HHM provides hotel and asset management services for properties in New York,
Massachusetts, Connecticut, New Jersey, Pennsylvania, Delaware, Virginia, Washington D.C.,
Rhode Island, Georgia, Florida, North Carolina, and California.

12.      HHM is affiliated with major hotel brands, including Marriott, Starwood, Hilton,
Hyatt, and Intercontinental.

13.      HHM employees are led by its Chief Executive Officer, Naveen Kakarla, and its
Chief Operating Officer, Michael Murray ("Murray").

14.      Defendants Furlong and McDonald were employed by HHM from November
2010 and October 2010 respectively, until Friday October 7, 2011.  At the outset of their
employment, each signed confidentiality agreements agreeing not to disclose any confidential
and/or trade secret information that they receive, and/or to which they gain access, while
employed with HHM.  *See* Exhibit A and Exhibit B.

15.      Furlong's and McDonald's jobs were closely intertwined with HHM's core
business functions.  Their jobs provided exposure to all types of HHM's confidential proprietary
business information, including customer and rate lists.  Furlong and McDonald also had access

4

to extremely confidential and sensitive information related to pricing and rate strategy, documents pertaining to how HHM structures agreements with its accounts, and proprietary tools designed to help HHM outperform its competitors. Access to even one set of these documents would be detrimental to HHM, but priceless for a competitor.

16.    Furlong and McDonald also executed agreements where each agreed not to encourage or solicit HHM employees to join a competitor.

17.    Furlong and McDonald were HHM's two most senior and experienced employees in the areas of sales and revenue. Each had dozens of direct reports, and even more subordinates.

18.    Furlong joined HHM in November 2010. She served as HHM's Vice President of Revenue Management. In this position, she was directly responsible for leading the strategic vision for room pricing and inventory distribution for all of HHM's hotels. She led an organizational network of Regional Directors and Area Directors for Revenue Management.

19.    McDonald joined HHM in October 2010. He served as HHM's Executive Vice President of Sales and Marketing. In this position, he was responsible for the development and execution of the company's strategy on driving revenue to HHM managed hotels. McDonald actively managed HHM's marketing initiatives, direct field sales deployment, revenue management, and e-Commerce initiatives.

20.    Before joining HHM, McDonald worked for TPG.

21.    Furlong's and McDonald's roles were fundamental to HHM's success, as each individual was involved intimately in overseeing and actively managing the revenue and sales at HHM managed hotels.

### McDonald and Furlong's Confidentiality and Non-Solicitation Agreements

22.    The hotel industry is a highly competitive industry in which trade secrets and confidential material are guarded closely.

23.    Companies like HHM scrutinize a hotel's business before acquisition, and maintain close surveillance of similar information after acquisition.

24.    Employees, like Furlong and McDonald, who work on revenue and sales are exposed to their employer's most confidential and sensitive documents relating to strategy. These employees also have access to programs that are specifically designed to allow a hotel company to outperform its competitors.

25.    As a result, violation of these types of agreements can be devastating to a company in the hotel industry, because departing employees can take the information and key employees essential to a hotel company's success. This is especially true when the employees leave to join a competitor.

26.    Consistent with industry practice, HHM requires employees at the senior management level to sign non-solicitation and confidentiality agreements.

27.    Furlong and McDonald both signed these types of agreements in conjunction with the start of their employment with HHM.

28.    At the start of her employment at HHM, Furlong signed a "Confidentiality, Non-Solicitation, and Non-Piracy Agreement" (the "Furlong Agreement") (a copy of the Furlong Agreement is attached as Exhibit A).

29.    The Furlong Agreement contains non-solicitation and confidentiality provisions.

30.    The clause related to non-solicitation of employees states:

> "Employee agrees that during the Non-Solicitation Period [defined as "during the Employee's employment with the Employer . . . and for a period of one (1) year following the effective date of the termination of Employee's employment"], Employee will not, without the prior written consent of the Employer, directly or indirectly, on the Employee's own behalf or on behalf of any person or entity, in any manner (a) actually or attempt to hire, recruit, or solicit for hire any employee of the Hersha Hospitality Entities *who was an employee during the six month period prior to the Employee's termination of employment with the Employer*, or

(b) solicit, influence, or attempt to influence, encourage, persuade or induce any current employee of the Hersha Hospitality Entities to terminate employment with any of the Hersha Hospitality Entities who was an employee during the six month period prior to the Employee's termination of employment with the Employer."

Exhibit A at ¶¶ 3(c), 4.

31.  Furlong similarly agreed not to solicit current or prospective HHM clients for one year following termination of her employment.  Exhibit A at ¶ 3(c).

32.  In the same agreement, Furlong also agreed that "both during the Employee's employment with the Employer and after its termination, the Employee will keep in confidence and trust all such Confidential Information, and will not, either directly or indirectly, at any time, while an employee of the Employer or thereafter, make known or disclose, reveal, furnish, make available, or use . . . any Confidential Information without the prior written consent of the Employer."  Exhibit A at ¶ 2(b).

33.  The Furlong Agreement defines "Confidential Information" as information "which relates to the Employer or other Hersha Hospitality Entities, is not generally known to the public or in the trade, is a competitive asset . . . or [is information] the disclosure of which could result in a competitive or other disadvantage to the Employer or any of the other Hersha Hospitality Entities."  Exhibit A at ¶ 2(a).

34.  In the event of termination, Furlong further agreed that "[a]ll documents, records, files, computer files, data, apparatus, equipment and other physical property, including all such materials in any form that constitute or contain Confidential Information . . . will be and remain the sole property of the Employer and shall be returned to the Employer . . . . The Employee will not retain in Employee's possession, custody or control any such material or property or any copies thereof after termination of Employee's employment or a request by the Employer for the return of such material or property."  Exhibit A at ¶ 2(c).

35.     Like Furlong, at the start of his employment at HHM, McDonald signed an employment agreement (the "McDonald Agreement") (a copy of the McDonald Agreement is attached as Exhibit B).

36.     The McDonald agreement contains non-solicitation and confidentiality provisions.

37.     As related to the solicitation of HHM employees, McDonald agreed that "for a period of twelve (12) months following the date of separation from employment" he would not "contract or approach either directly or indirectly for his own individual purposes or those of another, any employee of the Company for the purpose of attempting to or actually soliciting for hire that employee on his own account, or on account of another."  Exhibit B at ¶ 3(d)(2).

38.     The importance of HHM's confidential information also is recognized in the McDonald Agreement.  The McDonald Agreement states, "If the employee separates from employment with the company for any reason, Employee agrees that he will promptly (i) return all property, records, files, documents, materials and copies relating to the business of the Company which came into possession of Employee during his employment . . . ."  Exhibit B at ¶ 4(d).

39.     McDonald further agreed to "honor a fiduciary duty of loyalty to the Company, and . . . not to engage in any activity during the term of this Agreement that could in any way harm the business, business interests or reputation of the Company . . . . Employee will not directly or indirectly engage in competition with the Company, and Employee will not work for any other employer . . . ."  Exhibit B at ¶ 3(a).

40.     Finally, McDonald agreed that "both during and following his employment with the Company, he will not interfere in any way with the goodwill of the Company."  Exhibit B at ¶ 3(c).

8

## McDonald and Furlong suddenly resign from HHM

41.     On Monday, September 19, 2011, McDonald and Furlong each received written employment offers from TPG, both of which were amended on September 20, 2011.

42.     On Wednesday, September 21, 2011, Furlong and McDonald executed their offers of employment from TPG.

43.     On Friday, September 23, 2011, McDonald informed HHM, during a meeting with HHM's Chief Operating Officer, Murray, that he was resigning from HHM to go back to TPG.  He also stated that Furlong was resigning from HHM to accept a position with TPG as well.  Murray asked McDonald to reconsider and to spend the weekend thinking about whether there was anything HHM could do to encourage him to stay.

44.     The two companies are both hotel management firms and direct competitors. They actively compete in several geographic areas.  McDonald and Furlong's deep knowledge about HHM's sales and management strategies, as well as knowledge about HHM's efforts to sell into a specific market would be of great value to a competitive company with hotels in the same areas, i.e., a company just like TPG.  The two companies also manage properties for the same hotel brands.

45.     Neither Murray nor any other employees at HHM were aware that Furlong was resigning prior to learning that information from McDonald.

46.     Indeed, Murray was shocked by these resignations.  Both Furlong and McDonald were important employees and vital to the company's success.

47.     Furlong's resignation was particularly surprising because she had not worked for HHM for a full twelve-month period.  According to Furlong's employment agreement, if she did not work at HHM for at least one full year, she would be obligated to repay her relocation bonus of $10,000.

48.     Because he was shocked by her resignation and received the notice through McDonald, Murray e-mailed Furlong and requested an in-person meeting. Furlong and Murray agreed to meet on Sunday, September 25, 2011.

49.     At the September 25 meeting, Furlong said she intended to resign.

50.     Furlong was such an important employee, and so well respected, that Murray offered to do whatever it would take to keep her at HHM. Furlong said she would consider this offer.

51.     At separate meetings, the following morning, Monday, September 26, 2011, Furlong and McDonald each rejected Murray's offer and confirmed their decisions to join TPG. They agreed to stay on with HHM until October 21, 2011.

52.     Hours after turning in his resignation, McDonald informed Murray that Betty Procaccianti ("Procaccianti") at TPG intended to immediately announce to everyone at TPG that they hired McDonald and Furlong. Murray then immediately contacted Procaccianti to facilitate a smooth transition.

53.     Procaccianti is TPG's Chief Operations Officer.

54.     Murray told Procaccianti that he did not want McDonald's and Furlong's hiring with TPG to be public for a few weeks, because they were staying at HHM until October 21.

55.     But, Procaccianti ignored Murray's request; TPG announced McDonald's and Furlong's hiring that same night.

56.     Faced with TPG's refusal to delay their announcement, Murray announced Furlong's and McDonald's resignations at a morning meeting on September 27.

57.     A series of events over the next few days made HHM even more alarmed about the departures of McDonald and Furlong.

**HHM's Regional Director of Revenue Management suddenly resigns from HHM and joins TPG after McDonald and Furlong pressured him to accept TPG's offer.**

58.     David Singer ("Singer") was a Regional Director of Revenue Management at HHM, and worked under Furlong and McDonald.

59.     Furlong and Singer attended a breakfast together on Thursday, September 29, 2011 after Furlong already decided to resign from HHM.  Upon information and belief, McDonald was also at the breakfast.

60.     The same day, Singer telephoned Jillian Dunn ("Dunn"), a Human Resources Manager at HHM.  He told her that TPG also made him an offer of employment.

61.     At the time he received this offer of employment, Singer did not know anyone currently working at TPG.

62.     Upon information and belief, Singer's only connection to TPG was through Furlong and McDonald.

63.     Despite this offer, Singer told Dunn that he wanted to stay at HHM.

64.     Singer specifically asked Dunn about applying for Furlong's former position (Vice President of Revenue Management).  He also asked Dunn if the company would look internally or externally to fill the role.

65.     Dunn encouraged Singer to speak with Murray about the position.

66.     Because Dunn wanted Singer to be considered for the Vice President position, she called Singer the very next day to follow-up on their previous conversation.

67.     During this call, Singer told her that he already spoke with Murray about the Vice President position.

68.     Singer told Dunn that his conversation with Murray was "extremely helpful" and that he looked forward to meeting with Murray in person on Tuesday, October 4, 2011.

69.     Murray ended the conversation feeling good about Singer's commitment to HHM.

11

70.    In fact, Singer applied for the Vice President of Revenue Management position on Saturday, October 1, 2011.

71.    Shockingly, on Monday, October 3, 2011, Singer resigned from HHM to accept a position with TPG.

72.    Dunn immediately contacted Singer.  She expressed her confusion about his decision to join TPG, when – only two days earlier – he applied for the Vice President position at HHM.

73.    In response, Singer told Dunn that both Furlong and McDonald pressured him to make a decision about the job at TPG that day.  As a result of this pressure, Singer felt forced to accept TPG's offer.

74.    Although Singer had accepted the TPG offer, he agreed to speak with Murray the next day about the available Vice President position at HHM.

**HHM's Regional Director of Sales suddenly resigns from HHM and joins TPG.**

75.    Alan Swerdloff ("Swerdloff") was a Regional Director of Sales at HHM.  He worked directly under McDonald.

76.    After McDonald announced his resignation, Murray called Swerdloff to discuss any concerns he had about McDonald's departure.  During this call, Swerdloff never mentioned that he had an offer from TPG or that he might leave HHM.

77.    However, on October 3, 2011 – the very same day that Singer resigned – Swerdloff also resigned from HHM to accept an offer from TPG.

78.    Upon giving their resignations, McDonald, Furlong, Swerdloff, and Singer all agreed to continue their work at HHM until October 21, 2011.  However, the investigation described below resulted in early resignations by McDonald, Furlong, and Singer.

### HHM investigates the sudden resignations of the four key employees.

79.    On October 4, 2011, HHM management met separately with Furlong, McDonald, Swerdloff, and Singer.

80.    First, Joann Weber ("Weber"), Vice President of Human Resources, met with Swerdloff. He told Weber that TPG offered him a position on Monday, September 19, 2011. This is the same day that McDonald and Furlong received their written offers from TPG.

81.    Weber then met with Singer. He admitted that Furlong was the one who gave him the offer to join TPG. He explained to Weber that he was "floored" when Furlong made the offer to join TPG, because she offered him 20% more money than he was making at HHM.

82.    This statement is direct evidence that Furlong violated her non-solicitation agreement with HHM.

83.    At least three times during his meeting with Weber, Singer reiterated that he accepted the TPG offer on October 3, 2011 because Furlong and McDonald pressured him to make an immediate decision.

84.    These meetings make it clear that Furlong and McDonald were working with TPG to hire away both Swerdloff and Singer.

85.    Since this meeting with Singer, Singer informed HHM that he will be working for TPG at a competitive hotel in Alexandria, Virginia, the same market in which he worked for HHM. Furthermore, Singer told HHM that he only will be working on revenue management for two hotels managed by TPG, both of which are in cities that HHM also manages hotels.

86.    On October 4, 2011, Murray and Weber also confronted McDonald and Furlong regarding their involvement in hiring Singer and Swerdloff.

87.    Murray and Weber met separately with McDonald and Furlong.

88.    Murray and Weber first met with McDonald.

89.     Murray directly asked McDonald if he had any knowledge about Singer's offer at TPG.

90.     McDonald denied doing anything to solicit or recruit Singer. This claim was directly contradicted by Singer, who specifically told HHM that both McDonald and Furlong pressured him to join TPG.

91.     McDonald, however, conceded that Furlong was involved in hiring Singer. In fact, he indicated that Furlong was responsible for Singer's decision to join TPG.

92.     Similarly, McDonald claimed that Swerdloff applied for his job at TPG on his own, and he was not involved in recruiting Swerdloff. McDonald's own email communications belie this claim.

93.     Based on McDonald's questionable conduct, Murray advised McDonald that he was placed on immediate leave pending the company's investigation.

94.     After this meeting, while Weber waited with McDonald in his office for HHM's technology department to arrive, McDonald furiously typed on his handheld device. Upon information and belief, he was sending texts and/or e-mails to Furlong to warn her before she met with Murray and Weber.

95.     After their meeting with McDonald ended, Murray and Weber immediately met with Furlong.

96.     During this meeting, Furlong admitted that she spoke to at least "seven" HHM employees who expressed an interest in joining TPG. Furlong advised these employees to go to TPG's employment site and apply on-line.

97.     She also admitted that she helped Singer find a job at TPG.

98.     Further, Furlong stated that she could do whatever she wanted and denied having any restriction on solicitation or a related agreement; to the contrary, she explicitly signed the Furlong Agreement.

99.     Furlong did not appear concerned about the continuing obligations in the Furlong Agreement, even after being reminded about the agreement and seeing a copy of the agreement.

100.    Murray reminded Furlong that this restrictive covenant was critical because earlier in the conversation she admitted to helping HHM employees, including Singer, search for work at TPG.

101.    As Furlong well knew, and as Murray reminded her, helping HHM employees obtain employment at TPG would be in direct violation of her non-solicitation agreement.

102.    Murray and Weber concluded the meeting by telling Furlong that she too would be placed on leave during HHM's investigation.

**Despite McDonald's assurances that he was not involved in Swerdloff's hiring for TPG, his own communications with Swerdloff reveal a different story.**

103.    On October 3, McDonald and Swerdloff exchanged a series of emails.

104.    Swerdloff emailed McDonald about his resignation date from HHM.  McDonald responded that Swerdloff should indicate October 21, and, in the future, act as if McDonald did not know about the resignation.

105.    McDonald's attempt to hide his involvement with Swerdloff's resignation – in combination with his attempt to hide his involvement in Singer's departure – indicates that he likely played a larger role in recruiting and hiring away Swerdloff than he admits.

**While still being paid to work at HHM, McDonald actively engaged in extensive strategic and business communications with TPG employees while using HHM's computers.**

106.    In addition, HHM's investigation into Furlong's and McDonald's work e-mail accounts revealed that despite still being HHM employees, Furlong and McDonald had extensive

communications, on HHM's own e-mail server, with TPG employees about HHM's business strategy and how that impacted TPG's competing business strategy.

107.    Starting on September 27, 2011, McDonald – while still working at HHM – sent and received multiple emails from TPG employees regarding TPG's business strategy.

108.    On September 27, 2011, McDonald received multiple property performance reports, on his HHM e-mail account, from Michael Brown at TPG companies.

109.    On September 28, 2011, McDonald received an email from Lisa Hugo at TPG, which contained a detailed list of TPG's property contacts and sales vacancies.

110.    On October 3, 2011, McDonald received an email from Stephen Gordon at TPG.

111.    This email contained detailed information about an acquired hotel in Albany, New York, including that the hotel name needed to incorporate "Albany," how to incorporate "Albany" into the hotel website, and using "a '301 redirect' strategy from the old site to the new site . . . [as this] will at the very least ensure that not all is lost from our past SEO efforts." These are just some of the communications that McDonald had with TPG employees about competitive business issues while he still was working for HHM.

112.    These communications demonstrate that McDonald was actively working for TPG while he still was actively employed and being fully paid by HHM.

113.    Upon information and belief, McDonald's efforts for TPG regarding the development of business strategy coincided with his apparent efforts to recruit and lure away Singer and Swerdloff — all while he was still employed by HHM.

114.    This conduct is a fundamental and clear breach of McDonald's fiduciary duties that McDonald owed to HHM as an active HHM management employee.

**Just like McDonald, Furlong actively communicated with TPG employees regarding competitive business issues while she still was working for HHM.**

115.    Starting on September 29, 2011, Furlong sent many emails to TPG employees. She received many emails from TPG employees as well.

116.    For example, on October 3, 2011, Furlong received an email from Hilton Worldwide in Memphis about a specific American Express Weekend offer.

117.    Furlong, in turn, forwarded this email to more than 15 HHM employees, and discussed in that email how "Hilton failed to communicate this non-LRA program . . . which means it's highly likely its available for sale when we don't need it."

118.    Still a HHM employee, Furlong had a continuing duty of loyalty to HHM.

119.    Instead of acting in a manner loyal to HHM, Furlong wanted to ensure that her new company, TPG, also was aware of this important information.

120.    As a result, Furlong forwarded both the HHM email containing HHM strategy and the email from Hilton to Michael Brown at TPG asking, "Can you help us make sure this didn't negatively impact TPG anywhere?  Especially Hilton NYC.  Thanks!"

121.    This e-mail is just one example of Furlong's attempt to wear two hats at the same time.

122.    In fact, in this same email string, Furlong specifically states to McDonald: "I know you don't care about Hersha.  Neither do I."  She also expressed her continued loyalty to him.

123.    This communication confirms that, while they were being paid by HHM, McDonald and Furlong were acting inimically toward HHM's interests.

124.    Furlong had several, similar other communications with TPG employees.

125.    In the days following her resignation, Furlong played both sides of the fence:  she put on a front of working for HHM, only to secure additional information from HHM to benefit TPG.

126.    These communications demonstrate that Furlong was actively working for TPG while she still was actively employed and fully being paid by HHM.

127.    Upon information and belief, Furlong's efforts for TPG regarding the development of business strategy coincided with her apparent efforts to recruit and lure away Singer and Swerdloff – all while she still was employed by HHM.

128.    This conduct is a clear breach of the fiduciary duties that Furlong owed to HHM as an active HHM management employee.

**TPG's employment offers to the former HHM employees included substantial compensation that was above market and motivated by a specific intent to raid HHM.**

129.    TPG offered substantial compensation increases to McDonald and Furlong.  Upon information and belief, TPG offered above-market compensation levels to McDonald and Furlong in a blatant attempt to induce them to solicit additional employees and commit other wrongs.

130.    Upon information and belief, Defendants also offered Singer and Swerdloff substantial increases in compensation to induce them to leave HHM and join TPG.

131.    Upon information and belief, TPG offered these above-market compensation levels to harm HHM by luring away key employees and inducing them to commit wrongs.

**HHM's forensic analyses of McDonald's and Furlong's computers show extensive flash drive and external hard drive use under suspicious circumstances.**

132.    At the October 4, 2011 meetings, Furlong and McDonald denied ever having used portable USB drives on their HHM laptops.

133.    HHM hired a computer forensic consultant to analyze the HHM laptops used by McDonald and Furlong.  *See* Affidavit of Louis Cinquanto, EnCe (a copy of Louis Cinquanto's affidavit is attached as Exhibit C).

134.    Contrary to Furlong's and McDonald's denials, this forensic analysis revealed strong evidence that portable USB-memory devices were used on both computers, and that the devices were used close in time to Furlong's and McDonald's resignations.

135.    On at least four occasions, Furlong used at least four different USB drives on her computer:

- On September 1, 2011, Furlong's HHM laptop was last accessed by a HP v.125w Thumb Drive;

- On September 3, 2011, her HHM laptop was last accessed by a My Passport 0740 Thumb Drive;

- On September 21, 2011, her HHM laptop was last accessed by a Generic USB Flash Memory; and

- On October 3, 2011, her HHM laptop was last accessed by a Western Digital 250GB External Drive.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 17.

136.    Importantly, the forensic analysis shows only the last time the devices were plugged into the computer.  Indeed, it is likely that the drives were used on the laptop numerous additional times that are not reflected by the forensic analysis.

137.    The forensic analysis showed a Western Digital 250GB External Drive accessed McDonald's HHM laptop in July 2011.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 33.

138.    Interestingly, this is the exact same Western Digital 250GB External Drive that last accessed Furlong's HHM laptop on October 3, 2011 – several days after Furlong resigned from HHM.

139.    One gigabyte (GB) of data can hold approximately 75,000 pages of data.

140.    Thus, the Western Digital 250GB external drive that accessed both McDonald's HHM laptop and Furlong's HHM laptop could store about 18,750,000 pages of HHM data.

141.    The forensic examination of Furlong's HHM laptop also revealed that Furlong made substantial modifications to her computer on September 20 and September 22, 2011, just days before she announced her departure.

142.    The 3 REV TOOL KIT, a specific folder Furlong often accessed, was last modified on September 22, 2011, and currently is empty. Upon information and belief, Furlong created this folder to store documents that she planned to take with her to TPG.

143.    Furlong's actions on her computer, discovered by the forensic examination, underscore her suspect and deceitful behavior.

**McDonald and Furlong try to come "clean" regarding the USB drives but, in doing so, they continue to deceive HHM.**

144.    On October, 7, 2011, after receiving confirmation that memory drives were used on both computers, HHM once again asked McDonald and Furlong if they had any USB or external drives.

145.    In response, McDonald finally admitted having used one flash drive on his computer – "a USB drive shaped like a surfboard." But, he claimed that he "did not believe" that he used other devices.

146.    Similarly, Furlong admitted to having one external hard drive with HHM data on it. This was the Western Digital 250GB external drive referenced above.

147.    Importantly, Furlong did not mention the other USB devices revealed by the forensic investigation, and she claimed that the only other USB devices she used on the computer were a wireless mouse and a Blackberry charger.

148.    After Furlong finally admitted she had the Western Digital 250GB External Drive, HHM demanded the return of this drive.

149.    Upon receiving this request, Furlong claimed she was out of town, and could not return the drive to HHM until Monday, October 10, 2011.

**The forensic examination of the Western Digital 250GB external drive shows that (a) it contains more than 1,300 highly confidential HHM documents and (b) Furlong accessed this drive using an unknown computer on October 5 and October 7, 2011.**

150.    HHM then had a forensic examination completed for the Western Digital 250GB external hard drive.

151.    The forensic analysis revealed that the Western Digital 250GB external drive contained more than 1,300 HHM files that likely were copied from Furlong's HHM laptop. These files contain an extensive amount of HHM's highly confidential information and trade secrets including:

- detailed financial analyses and revenue projections;

- pricing strategies and analyses;

- existing and future detailed budget information;

- extensive information and analysis regarding HHM's new business opportunities;

- detailed information regarding HHM's special pricing for wholesale and other customers;

- HHM's revenue management tools;

- highly sensitive information regarding compensation and benefits paid to HHM employees; and

- sales presentations and pitch books for key HHM customers.

152.    Unfortunately, this is the exact type of information that HHM would not want to fall into the hands of TPG or any other competitor.

153.    A competitor like TPG could use this information to cause great damage to HHM by, among other things:

- gaining vital insight into HHM's business strategies and operations;

- gaining access to HHM's marketing plans and strategies;

- using HHM's sales information to steal customers from HHM and to identify HHM's most important customers;

- analyzing HHM's current and future budgets to determine how to take advantage of HHM's plans for growth;

- plundering HHM's new business opportunities, which HHM has spent substantial resources to develop; and

- exploiting HHM's highly sensitive and confidential pricing information.

154.    Moreover, the information regarding other employees' compensation specifically could be used by TPG to continue its raiding efforts against HHM.

155.    A comparison of the data from Furlong's HHM computer and the Western Digital 250GB external drive revealed that there were 1,314 instances of data from Furlong's HHM computer on the drive. When these results were de-duplicated, there were 1,144 unique files from Furlong's HHM computer that existed on the external hard drive. Many of these files had "HERSHA" in the file name or path. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 29.

156.    When she returned the Western Digital 250GB external drive, Furlong tried to claim that she used this drive for monthly back-ups.

157.    But, the forensic examination contradicts this claim. Specifically, there are almost 9,000 (non de-duped) documents, spreadsheets, and pdf files on her HHM laptop; the Western Digital 250GB external drive has only 1,314 files (non de-duped) on it that match Furlong's HHM laptop. If Furlong was truly using the Western Digital external drive for merely backing up her HHM laptop, this external drive would have many more files on it that match the ones on her HHM laptop. *See* Affidavit of Louis Cinquanto, EnCe at ¶¶ 31-32.

158.    This forensic examination also revealed that on October 3, 2011, some documents were accessed in "machine gun" fashion which, from a forensic standpoint, is indicative of copying multiple files at once. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 22.

159.    Furthermore, on October 3, 2011, Furlong remotely logged onto HHM's network and accessed numerous files, and then, only seconds later, connected this external hard drive. This behavior is indicative of attempts to copy data. *See* Affidavit of Louis Cinquanto, EnCe at ¶¶ 23-24.

160.    After October 5, 2011, more than 47 folders and files were accessed on the hard drive by a non-HHM computer. These files could not have been accessed on Furlong's HHM computer, because Furlong returned her computer to HHM on October 4, 2011. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 30.

161.    The forensic investigation revealed additional use of the external drive after Furlong returned her HHM computer. *See generally* Affidavit of Louis Cinquanto, EnCe.

162.    On October 7, 2011, a folder on the hard drive called "HERSHA" was accessed. This folder contains more than 10,854 different types of files and subfolders, and 11,390 instances of the word "HERSHA" in the metadata and documents' content. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 31.

163.    The accessing of these folders is troubling because of the vast amounts of confidential information they contain. One reason to access the files would be, of course, to copy them onto an unknown, target computer. The only way to determine if these files have not actually been surreptitiously copied is to access this unknown, target computer.

164.    Furlong and McDonald have breached their duties of loyalty to HHM by engaging in action inimical to HHM's interests while in its employ, and have misappropriated HHM's trade secrets and confidential information.

165.    Furlong and McDonald have breached the non-solicitation and confidentiality clauses in their employment agreements.

166.    Defendants engaged in unfair competition with HHM and tortiously interfered with HHM's business and contractual relations for improper motives and with improper means.

167.    Upon information and belief, Defendants have converted HHM's proprietary, confidential, and trade secret information.

168.    Upon information and belief, all Defendants conspired together to engage in unlawful acts and achieve unlawful means, all as alleged above.

169.    Defendants' actions have been willful, malicious, and outrageous and undertaken with reckless indifference to the rights of HHM.

## COUNT I

### INJUNCTIVE RELIEF
### (Against All Defendants)

170.    HHM repeats and realleges the allegations of paragraphs 1 through 169 of this Complaint as if fully set forth herein

171.    As alleged above, Defendants' conduct violates the McDonald Agreement and the Furlong Agreement; and constitutes misappropriation of trade secrets under the Pennsylvania Uniform Trade Secrets Act, misappropriation of confidential information in violation of Pennsylvania common law, breach of fiduciary duty, conspiracy, tortious interference, and conversion.

172.    By virtue of the foregoing, HHM has demonstrated a likelihood of success on the merits and that the balancing of the equities favors the issuance of an injunction against Defendants.

173.    Unless Defendants are temporarily restrained and/or preliminarily and permanently enjoined from breaching the McDonald and Furlong Agreements, from interfering with HHM's employment and business relationships and from using and disclosing the

confidential information and trade secrets that were taken from HHM, HHM will be immediately and irreparably harmed by the:

A.   Disclosure of HHM's confidential, proprietary information and trade secrets, including all confidential information and trade secrets that Defendants McDonald and Furlong had access to as a result of their employment with HHM;

B.   Loss of goodwill and business reputation in the hotel management industry;

C.   Loss of existing clients, prospective clients, existing employees, and prospective employees;

D.   Loss of potential business that McDonald and Furlong were responsible for immediately before they resigned;

E.   Loss of business that McDonald and Furlong are diverting to TPG; and

F.   Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

G.   Moreover, unless Defendants are ordered to relinquish immediately to the Court for inspection by HHM (or its designated representative) all portable memory devices, including flash drives, USB drives and external hard drives that McDonald and/or Furlong had access to during their employment at HHM, including any portable memory devices or computers issued to them by TPG, HHM will be immediately and irreparably harmed by:

1.      the potential destruction of all evidence, including electronic indicia, which could be used to determine to whom Defendants potentially disclosed the confidential information and trade secrets that they may have stolen, retained and/or transferred to TPG;

2.      the continued misappropriation of HHM's confidential information and trade secrets; and

3.      the potential destruction of the subject electronic media that could have been used to store HHM's confidential information and trade secrets.

174.    The losses suffered by HHM as the result of Defendants' conduct cannot be fully or adequately compensated in money damages, and HHM does not have an adequate remedy at law.

175.    Greater injury will be inflicted upon HHM by the denial of the injunctive relief than would be inflicted upon the Defendants by the granting of such relief. The public will benefit by the issuance of the Injunctive Order requested by HHM in this matter.

## COUNT II

### BREACH OF CONTRACT
### (Against McDonald and Furlong)

176.    HHM repeats and realleges the allegations of paragraphs 1 through 175 of this Complaint as if fully set forth herein.

177.    As part of the McDonald Agreement, McDonald entered into a confidentiality agreement with HHM.

178.    As part of the Furlong Agreement, Furlong entered into a confidentiality agreement with HHM.

179. The McDonald Agreement and the Furlong Agreement are valid and binding contracts supported by consideration.

180. Upon information and belief, Furlong and McDonald breached and continue to breach the express terms of their respective confidentiality agreements by using and/or disclosing HHM's confidential information beyond the limitations set forth in the confidentiality agreements and by failing return all of HHM's proprietary, confidential, and trade secret information.

181. As part of the McDonald Agreement, McDonald entered into a non-solicitation agreement with HHM.

182. As part of the Furlong Agreement, Furlong entered into a non-solicitation agreement with HHM.

183. Furlong and McDonald breached the express terms of their respective non-solicitation agreements by soliciting, encouraging, and/or persuading HHM's employees to join TPG.

184. As a direct and proximate result of Furlong's and McDonald's breach of the confidentiality agreements and non-solicitation agreements, HHM has sustained substantial damages.

185. Further, by reason of Furlong's and McDonald's use and/or disclosure of HHM's confidential information, HHM has sustained and, if Defendants' acts are not immediately and permanently enjoined, will continue to sustain irreparable harm for which no adequate remedy at law exists.

186. Defendants' actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights of HHM.

## COUNT III

### MISAPPROPRIATION UNDER PENNSYLVANIA'S TRADE SECRET ACT, 12 Pa. Cons. Stat. § 5301, *et. seq.*
### (Against All Defendants)

187.    HHM repeats and realleges the allegations of paragraphs 1 through 186 of this Complaint as if fully set forth herein.

188.    Upon information and belief, Defendants have misappropriated HHM's trade secrets and confidential information without the express or implied consent of HHM.

189.    Furlong, while employed by HHM, accessed and downloaded from her work computer thousands of highly confidential files, many of which are trade secrets under Pennsylvania's Trade Secret Act, 12 Pa. Cons. Stat. § 5301, *et seq.*

190.    Despite his denials, McDonald's HHM laptop was accessed by an external hard drive in July 2011. This drive contains thousands of HHM documents (including highly confidential information and trade secrets). The drive also was accessed (in October 2011) on Furlong's HHM laptop.

191.    Moreover, the forensic examination conclusively proves that at least three other USB memory devices were used on Furlong's HHM laptop in September 2011. Furlong, however, denied the existence of these devices. Her denials are not credible.

192.    Upon information and belief, these three "missing" USB devices contain HHM's highly confidential information and trade secrets.

193.    HHM's confidential information, described throughout this Complaint, constitute trade secrets that are not known in the industry, and provide HHM with an advantage over competitors who do not know the confidential information. Therefore, this information has independent value from not being generally known.

194.    McDonald and Furlong also have knowledge of HHM's budgets, revenue projections, marketing strategies, existing and prospective customers, pricing, programs, new

program developments and numerous other types of competitive information that are highly confidential and constitute trade secrets. Upon information and belief, McDonald and Furlong have used or disclosed, or are likely to use or disclose, this information in the performance of their duties for TPG.

195.    Upon information and belief, because Furlong and McDonald had access to and have taken HHM's trade secrets, and because, upon information and belief, TPG has used or allowed the use of HHM's trade secrets, it is also inevitable that TPG and the persons acting in concert with TPG will use and disclose such secrets when working on behalf of TPG's competing hospitality management business.

196.    HHM has expended substantial resources in developing its trade secrets and confidential information for its exclusive benefit.

197.    HHM's trade secrets and confidential information derive economic value from the fact they neither are generally known nor readily ascertainable by proper means of any third parties.

198.    HHM does not disclose its trade secrets or confidential information to its competitors and has made reasonable efforts to protect their confidentiality, including the use of confidentiality agreements and identifying information as confidential.

199.    HHM communicated its trade secrets and confidential information to McDonald and Furlong in confidence, and McDonald and Furlong knew that HHM intended for its trade secrets and confidential information to remain confidential.

200.    Furlong and McDonald had a duty to maintain such confidential information in confidence and to use the information only for the limited purpose of carrying out their job responsibilities with HHM.

201.    All Defendants have a duty not to use HHM's confidential information and a duty not to allow their agents or employees to use HHM's confidential information.

202.    Defendants have been unjustly enriched by the misappropriation of HHM's trade secrets.

203.    Upon information and belief, Defendants have willfully, maliciously, and in bad faith used and/or disclosed HHM's trade secrets in violation of Pennsylvania's Trade Secret Act, 12 Pa. Cons. Stat. § 5301, *et seq*, thereby evincing a reckless indifference to HHM's rights.

204.    HHM's trade secret information, including, but not limited to, that information referenced above, is of a special, unique, ordinary, and intellectual character, giving it special and unique value, the loss of which may not be reasonably or adequately compensated in damages.

205.    By reason of Defendants' conduct, HHM has sustained and, if Defendants are not enjoined, will continue to sustain substantial damages the precise amount of which will be determined at trial.

206.    Further, Defendants' use and disclosure of HHM's confidential information and other trade secrets have caused and will continue to cause HHM irreparable harm for which no adequate remedy at law exists.

## COUNT IV

### BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY
### (Against McDonald and Furlong)

207.    HHM repeats and realleges the allegations of paragraphs 1 through 206 of this Complaint as if fully set forth herein.

208.    HHM authorized Furlong to act as its agent in her capacity as its Vice President of Revenue Management.

209.    HHM similarly authorized McDonald to act as its agent in his capacity as Executive Vice President of Sales and Marketing.

210.    As agents of HHM, McDonald and Furlong owed HHM a fiduciary duty, including a duty of loyalty.

211.    McDonald and Furlong, through their actions as set forth herein, intentionally and willfully violated their fiduciary duties to HHM by taking actions against HHM's interest while still employed by HHM. These actions include, but are not limited to:  (a) soliciting HHM's employees and diverting such employees away from employment with HHM; (b) seizing for their own personal gain confidential information and trade secrets which are essential to HHM's business strategy and overall success, and sharing said information with their new employer TPG; and (c) simultaneously conducting business for TPG and HHM, on HHM's own network servers, while still employed by and being compensated by HHM.

212.    By and through their above actions, Furlong and McDonald have breached their fiduciary duties owed to HHM.

213.    As a direct and proximate result of Furlong's and McDonald's breaches of their fiduciary duties, HHM has suffered substantial damages.

214.    Defendants' actions have been willful, malicious, and outrageous and undertaken with reckless indifference to the rights of HHM.

## COUNT V

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against TPG)

215.    HHM repeats and realleges the allegations of paragraphs 1 through 214 of this Complaint as if fully set forth herein.

216.    Upon information and belief, TPG knowingly aided and abetted McDonald's and Furlong's efforts to breach their fiduciary duties by acting as a facilitator of, and co-conspirator in, the actions described herein.

217.    Upon information and belief, TPG provided McDonald and Furlong substantial assistance in breaching their fiduciary duties to HHM.

218.    As a direct and proximate result of TPG's acts, HHM has suffered substantial damages.

219.    TPG's actions have been willful, outrageous, and undertaken with reckless indifference to the rights of HHM.

## COUNT VI

## TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL AND PROSPECTIVE BUSINESS ADVANTAGE
### (Against All Defendants)

220.    HHM repeats and realleges the allegations of paragraphs 1 through 219 of this Complaint as if fully set forth herein.

221.    As described above, HHM has developed trade secrets and confidential information, and this information provides HHM with an advantage over its competitors.

222.    HHM had a reasonable expectation of economic advantage that has been lost as a result of Defendants' improper and malicious interference through their misappropriation of HHM's confidential information and trade secrets.

223.    Further, HHM has spent considerable time and resources developing and hiring employees, like Singer and Swerdloff.  The employment of individuals, like Singer and Swerdloff, gives HHM an advantage over its competitors.

224.    HHM has a reasonable expectation of continued business relations with its existing and prospective employees.  Defendants wrongfully, tortiously, and without privilege

32

interfered with such relationships by willfully conspiring to lure away employees from HHM in violation of existing contractual obligations and well-established fiduciary duties, all of which were with the purpose or intent to harm HHM.

225.    By tortiously interfering with HHM's existing or prospective employees, Defendants have caused and will continue to cause HHM actual, immediate, and irreparable harm for which HHM has no adequate remedy at law.

226.    By tortiously interfering with HHM's existing or prospective employees, Defendants have acted intentionally, willfully, maliciously, and with reckless indifference to HHM's rights.

227.    Defendants will continue such wrongful conduct unless immediately and permanently enjoined.

228.    As a direct and proximate result of Defendants' interference, HHM has suffered substantial damages, for which Defendants are liable.

229.    Defendants' actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights of HHM.

## COUNT VII

## CONSPIRACY
### (Against All Defendants)

230.    HHM repeats and realleges the allegations of paragraphs 1 through 229 of this Complaint as if fully set forth herein.

231.    Upon information and belief, Defendants combined and acted with a common plan and purpose to illegally solicit, recruit, and hire away HHM's employees.

232.    Upon information and belief, Defendants combined and acted with a common plan and purpose to misappropriate HHM's confidential information, trade secrets, and other property by engaging in the unlawful acts described above.

33

233.    Upon information and belief, Defendants committed overt acts, as described above, including, but not limited to, the unauthorized downloading and taking of trade secrets and confidential information, and competing against HHM while McDonald and Furlong were still employees, all in pursuit of the common purpose described above.

234.    As a direct and proximate result of the acts done in furtherance of the conspiracy, HHM has been damaged, including damages to HHM's overall business and operations, and damage in the form of expenses related to investigative and remedial actions taken to address the effects of the conspiracy. HHM has suffered, and will continue to suffer, these injuries.

235.    As a direct and proximate result of Defendants' conspiracy, HHM has suffered substantial damages.

236.    Defendants' actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights of HHM.

## COUNT VIII

### UNJUST ENRICHMENT
### (Against All Defendants)

237.    HHM repeats and realleges the allegations of paragraphs 1 through 236 of this Complaint as if fully set forth herein.

238.    By utilizing HHM's confidential proprietary information and trade secrets, Defendants secured advantages and benefits from information to which they were not entitled.

239.    Upon information and belief, Defendants currently remain in possession of this information.

240.    Defendants have no entitlement to any information that they have taken, retained, and/or received from HHM.

241.    The taking and securing of this information has been, and will continue to be, detrimental to HHM's current and future business prospects.

34

242.    Upon information and belief, Defendants have continued to use the ill-gotten property for their own benefit.

243.    Through these actions, Defendants have benefitted from the use of HHM's information for which they paid no consideration.

244.    Further, by conspiring to improperly solicit, recruit, and lure away key employees from HHM, Defendants have secured advantages and benefits from these individuals to which they were not entitled.

245.    Defendants have continued to benefit from employing these individuals.

246.    The conduct described above is both inequitable and unjust.

247.    As a direct and proximate result of Defendants' unjust enrichment, HHM has suffered substantial damages.

248.    Defendants' actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights HHM.

## COUNT IX

## CONVERSION
### (Against All Defendants)

249.    HHM repeats and realleges the allegations of paragraphs 1 through 248 of this Complaint as if fully set forth herein.

250.    HHM retained all rights, titles, and interest in the trade secrets and other information and property taken by Defendants.

251.    By taking HHM's documents and information, Defendants deprived HHM of the use of this information, without HHM's consent, and without lawful justification.

252.    As a direct and proximate result of Defendants' illegal conversion, HHM has suffered substantial damages.

253.    Defendants' actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights of HHM.

## COUNT X

## UNFAIR COMPETITION
### (Against All Defendants)

254.    HHM repeats and realleges the allegations of paragraphs 1 through 253 of this Complaint as if fully set forth herein.

255.    By illegally soliciting and hiring HHM's employees and misappropriating HHM's trade secrets and confidential information, Defendants have intentionally interfered with HHM's ability to fairly compete with TPG.

256.    Moreover, TPG has hired HHM's employees not because they are particularly gifted or skilled, but because they want to injure HHM and to induce HHM's employees to improperly disclose HHM's confidential information and trade secrets and to misappropriate the client relationships these employees developed while employed at HHM.

257.    Upon information and belief, TPG offered substantial increases in compensation to the former HHM employees and hired them for the sole purpose of injuring HHM.

258.    Upon information and belief, TPG offered substantial increases in compensation to the former HHM employees and hired them for the sole purpose of inducing them to commit wrongs.

259.    Upon information and belief, Defendants have committed these acts maliciously and for the sole purpose of inflicting harm on HHM or to benefit themselves at HHM's expense.

260.    As a direct and proximate result of Defendants' unfair competition, HHM has suffered damages.

261.    Defendants' actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights of HHM.

## COUNT XI

## COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030
### (Against Furlong)

262.    HHM repeats and realleges the allegations of paragraphs 1 through 261 of this Complaint as if fully set forth herein.

263.    In September 2011 (and perhaps much earlier), Furlong, knowingly and with intent to defraud, accessed HHM's protected computer network and files maintained on her HHM laptop – and by means of such conduct, defrauded HHM and obtained for herself information of substantial value.

264.    HHM's policies make it clear that employees, like Furlong, shall not copy HHM's information onto external storage media, like a flash drive or external drive.

265.    Upon information and belief, at the time Furlong accessed and downloaded HHM's critical information, Furlong had already accepted an offer with TPG and surreptitiously started competing against HHM.

266.    Upon information and belief, Furlong's unauthorized access continued until she formally resigned her employment from HHM and continued after she left HHM.

267.    Furlong's downloading of massive quantities of HHM's confidential information and trade secrets for no legitimate purpose was in excess of her authorization access to HHM's computer network system.

268.    Furlong accessed and copied more than 1,000 HHM computer files and records in excess of her authority from HHM.

269.    HHM has incurred substantial costs well in excess of $5,000 in its investigation and response to Furlong's conduct.

270.    As a direct and proximate result of this unauthorized copying, diverting, misappropriating, using, and/or gaining access to HHM's computer equipment, documents and

information, including trade secrets and confidential information, through the fraudulent and

unauthorized use of protected computers, and by causing losses to HHM in excess of $5,000,

Furlong has violated the Computer Fraud and Abuse Act and harmed HHM.

271.    As a direct and proximate result of Furlong's violation of the Computer Fraud and

Abuse Act, and continued unlawful use of the documents and information taken from HHM,

HHM will continue to suffer irreparable harm.

272.    Furlong's actions have been willful, malicious, outrageous, and undertaken with

reckless indifference to the rights of HHM.

### REQUEST FOR JURY TRIAL

HHM demands a trial by jury as to all claims that may be tried to a jury.

### PRAYER FOR RELIEF

WHEREFORE, HHM respectfully requests the following relief:

A.    A preliminary and permanent injunction requiring Defendants and/or any persons

or entities acting in concert with them:

1.    To immediately return all materials, including those in electronic format,

that any of the Defendants took from HHM or otherwise improperly

received from HHM.

2.    To immediately return all of HHM's confidential information and trade

secrets, including but not limited to:  information regarding pricing;

customer contacts and development; marketing strategies; financial

analyses and projections; new program initiatives; past, present, and/or

future budgets; past, present, and/or future revenue projections and

programs, customer histories; new customer opportunities; sales

presentations and pitch books; HHM employee compensation and

personnel information; and potential customer and lead information.

3.      To immediately preserve all electronic information, including all data

stored in electronic form on a computer-based system, that is in the

possession, custody, and/or control of any of the Defendants.

4.      To immediately take all other measures necessary to ensure that no

electronically stored data potentially relating to this matter in any of the

Defendants' possessions, custodies and/or controls are erased, deleted, or

otherwise destroyed.

5.      To immediately cease engaging in any conduct which directly or indirectly

interferes, hinders, obstructs, or impedes HHM's actual or prospective

business relationships with its employees, existing clients, and prospective

clients.

6.      To immediately cease recruiting, soliciting, inducing, attempting to induce

away, and/or contacting any HHM employee for the purpose of potentially

employing them at TPG.

7.      To, with regard to Defendant McDonald, immediately comply with all

obligations set forth in the Employment Agreement between McDonald

and HHM dated October 4, 2010.

8.   To, with regard to Defendant Furlong, immediately comply with all obligations set forth in the Confidentiality, Non-Solicitation, and Non-Piracy Agreement between her and HHM dated November 11, 2010.

9.   To immediately relinquish to the Court, for inspection by HHM's designated representative:

    (i)   all portable memory devices, including flash drives, USB drives, and external had drives that Defendant McDonald had access to during his employment at HHM, including any portable memory devices and/or computers issued to him by TPG;

    (ii)   all portable memory devices, including flash drives, USB drives, and external had drives that Defendant Furlong had access to during her employment at HHM, including any portable memory devices and/or computers issued to her by TPG;

    (iii)   all floppy disks, CDs, computers, USB drives, flash drives, external hard drives, and/or other computer memory storage media that – at anytime – stored any information that Defendants received, retained, and/or took from HHM;  and

    (iv)   all computers that TPG issued Defendant McDonald and Defendant Furlong.

10.   To immediately provide user names and passwords for any web-based or internet cloud-based services that Defendants have used to store and/or

40

access any of HHM's proprietary, confidential, and/or trade secret

information.

11.    To immediately cease doing business, until further Order of this Court,

with HHM's clients for which TPG did not do any actual business before

Defendant McDonald and Defendant Furlong accepted employment offers

from TPG.

B.    Actual, compensatory, and punitive damages in an amount exceeding $75,000,

with a precise figure to be determined at trial;

C.    Prejudgment and post-judgment interest;

D.    HHM's reasonable attorney fees, expert fees, and costs incurred in this matter,

pursuant to 12 Pa. Cons. Stat. § 5305, Pennsylvania's Uniform Trade Secrets Act;

and

E.    Any other relief this Court deems necessary, just, and proper.

Respectfully submitted,

COZEN O'CONNOR

By: _____

David J. Walton (ID #86019)
Rachel S. Fendell (ID #308751)
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000
Attorneys for Plaintiff
Hersha Hospitality Management

Dated: October 17, 2011

**EXHIBIT A**

## CONFIDENTIALITY, NON-SOLICITATION, AND NON-PIRACY AGREEMENT

This Confidentiality, Non-Solicitation, And Non-Piracy Agreement (**"Agreement"**), made as of this ___11___ day of ___NOV___, 20_10_, by and between Hersha Hospitality Management, LP (the **"Employer"**), and ___KIMBERLY FURLONG___ (**"Employee"**).

**WHEREAS**, the parties hereto acknowledge that the Employer considers the protections provided by this Agreement to be necessary to safeguard Confidential Information (as defined below), relationships, goodwill, competitive advantages and other business interests of the Employer and its parents, subsidiaries, affiliated or related entities as currently exist or may come to exist during Employee's employment (collectively with the Employer, the **"Hersha Hospitality Entities"**);

**WHEREAS**, Employer is willing to employ Employee or continue Employee's employment only if Employee agrees to accept and continues to abide by the obligations set forth herein; and

**NOW, THEREFORE**, in consideration of Employee's employment and continued employment with the Employer, access to Confidential Information (as defined below), Clients (as defined below) and Potential Clients of the Employer and/or other Hersha Hospitality Entities, other good and valuable consideration, the receipt of which is acknowledged, and the covenants, promises, obligations and conditions herein contained, the parties hereto agree as follows:

1.      **Certain Terms.**

For purposes of this Agreement:

(a)      The term **"Client"** is defined as any person, corporation or other entity, including hotel and property owners, which has requested the Employer or other Hersha Hospitality Entities, orally or in writing, to perform services or provide products of any type or character which the Employer or other Hersha Hospitality Entities may provide from time to time.

(b)      The term **"Potential Client"** is defined as any person, corporation or other entity, including hotel and property owners, with which any employee of the Employer has had communications regarding the possibility of rendering  services or providing products of any type or character which the Employer or other Hersha Hospitality Entities may provide from time to time.

2.      **Confidential Information and Non-Disclosure.**

(a)      Employee acknowledges that, by reason of Employee's employment and duties, Employee will be given or may have access to or become informed of confidential or proprietary information which the Employer and other Hersha Hospitality Entities possess or to which the Employer or other Hersha Hospitality Entities have access, and which relates to the

Employer or other Hersha Hospitality Entities, is not generally known to the public or in the trade, is a competitive asset, constitutes a "trade secret" (as that term is defined by applicable law), or the disclosure of which could result in a competitive or other disadvantage to the Employer or any of the other Hersha Hospitality Entities (collectively and individually, **"Confidential Information"**), including without limitation, such information concerning: (i) any of the Hersha Hospitality Entities' financial information, reports, models, tools, strategies and forecasts; (ii) marketing, development, projects, products and services, inventions, innovations, designs, ideas, plans, patents, computer systems, software, advertising, distribution, sales methods and systems, sales and profit figures, pricing policies; (iii) any data, records, business strategies, acquisition strategies, development strategies, operations strategies, business opportunities, operations or techniques, potential "deal" lists or information, or financial, market or economic modeling tools of any of the Hersha Hospitality Entities; (iv) lists, identities, names, addresses, characteristics, or preferences of, and contacts at, Clients or Potential Clients, as well as other confidential and proprietary information of or concerning such Clients or Potential Clients, including such Clients' or Potential Clients' confidential business information, operations and condition (financial or otherwise), the fact that they are doing or have done business with any of the Hersha Hospitality Entities, and the specific matters on which they are doing or have done business; (v) research, operations, acquisitions, development, financial or investment reports prepared by or for, or commissioned or paid for by, any of the Hersha Hospitality Entities; (vi) planning data and marketing strategies of any of the Hersha Hospitality Entities; (vii) financial results and information about the business condition, including relationships with Clients, Potential Clients, or agents of any of the Hersha Hospitality Entities; (viii) any investment, management or advisory agreement or other material contract of any of the Hersha Hospitality Entities; (ix) inventions, improvements, other intellectual property, trade secrets and proprietary software and related documents of any of the Hersha Hospitality Entities; and (x) personnel lists and information of any of the Hersha Hospitality Entities.  Confidential Information includes information developed, created or compiled by the Employee in the course of Employee's employment by the Employer, as well as other such information to which the Employee may have access in connection with Employee's employment.

   (b) Employee acknowledges that Employee's employment creates a relationship of trust and confidence between the Employee and the Employer with respect to Confidential Information, and that Confidential Information, whether developed, compiled or created by Employee or by the Employer or any of the other Hersha Hospitality Entities, is and will remain the sole property of the Employer or such other Hersha Hospitality Entities (as the case may be).  Employee agrees that at all times, both during the Employee's employment with the Employer and after its termination, the Employee will keep in confidence and trust all such Confidential Information, and will not, either directly or indirectly, at any time, while an employee of the Employer or thereafter, make known or disclose, reveal, furnish, make available, or use (except as is reasonably deemed necessary by Employee for use in the regular course of Employee's duties for the Employer) any Confidential Information without the prior written consent of the Employer.  Employee understands and acknowledges that Employee's obligations under this Section 2 shall survive termination of Employee's employment and will continue indefinitely unless and until any such Confidential Information has become, in the Employer's reasonable judgment, stale or, through no fault of the Employee, generally known to the public, or if Employee is required by law or court order to make such disclosure (after providing the Employer with notice and an opportunity to contest such requirement).

(c)    All documents, records, files, computer files, data, apparatus, equipment and other physical property, including all such materials in any form that constitute or contain Confidential Information, including all copies thereof, will be and remain the sole property of the Employer and shall be returned to the Employer upon the first to occur of (i) termination of Employee's employment for any reason or (ii) request by the Employer. The Employee will not retain in Employee's possession, custody or control any such material or property or any copies thereof after termination of Employee's employment or a request by the Employer for the return of such material or property.

3.    <u>Non-Solicitation of Clients and Business.</u>

(a)    Employee acknowledges that the Employer and other Hersha Hospitality Entities are engaged in a highly competitive business, and that their relationships with their Clients and Potential Clients, goodwill and Confidential Information are extremely valuable, provide them with competitive business advantages and are critical to their success. Employee further acknowledges that, by virtue of Employee's employment and duties, Employee has and will have close contact with Clients, has developed and will develop relationships with Clients and goodwill on behalf of the Employer, has and will have access to, possesses and will possess, and has developed and will develop Confidential Information of and on behalf of the Employer and/or to the benefit of other Hersha Hospitality Entities.

(b)    Employee further acknowledges that Employee would inevitably have to draw on such Confidential Information, relationships with Clients and goodwill of the Hersha Hospitality Entities if Employee were to (i) solicit such Clients or potential Clients on behalf of any person or entity other than the Hersha Hospitality Entities, or (ii) solicit or appropriate (other than for the Hersha Hospitality Entities) opportunities or business transactions being considered or worked on by any of the Hersha Hospitality Entities; and that any such solicitation or appropriation of such Clients, opportunities or transactions would cause the Hersha Hospitality Entities great and irreparable harm.

(c)    Employee therefore agrees that during Employee's employment with the Employer (or with any successors or assigns thereof) and for a period of one (1) year following the effective date of the termination of Employee's employment (the "**Non-Solicitation Period**"), regardless of the reason for such termination and regardless of whether Employee's employment is terminated by Employee or the Employer (or any successor or assign thereof), Employee shall not, without the prior written consent of the Employer, on Employee's own behalf or on behalf of any person or entity (other than for the benefit of any of the Hersha Hospitality Entities), directly or indirectly, in any manner:

(i)    with respect to any Clients for whom the Employee, during the one year period prior to the termination of the Employee's employment, performed services, had responsibility, or had material knowledge of services performed by any of the Hersha Hospitality Entities:

(A)  call upon, canvass or solicit the business of such Clients;

(B) actually or attempt to influence, encourage, persuade or induce any such Clients to cease doing business with or reduce the extent of its business dealings with any of the Hersha Hospitality Entities; or

(ii)    with respect to any Potential Clients for or with respect to whom the Employee, during the one year period prior to the termination of the Employee's employment, had responsibility, participated in any discussions or meetings, or participated in any presentations, proposals, or preparation of any presentations or proposals:

(A) call upon, canvass or solicit the business of such Potential Clients;

(B) actually or attempt to influence, encourage, persuade or induce any such Potential Clients to not do business with any of the Hersha Hospitality Entities.

## 4.    Non-Solicitation of Employees.

Employee agrees that during the Non- Solicitation Period, Employee will not, without the prior written consent of the Employer, directly or indirectly, on the Employee's own behalf or on behalf of any person or entity, in any manner (a) actually or attempt to hire, recruit, or solicit for hire any employee of any of the Hersha Hospitality Entities who was an employee during the six month period prior to the Employee's termination of employment with the Employer, or (b) solicit, influence, or attempt to influence, encourage, persuade or induce any current employee of any of the Hersha Hospitality Entities to terminate employment with any of the Hersha Hospitality Entities who was an employee during the six month period prior to the Employee's termination of employment with the Employer.

## 5.    Non-Disparagement.

Employee agrees that Employee shall not disparage any of the Hersha Hospitality Entities.  For purposes of this provision, the term "disparage" includes making comments or statements by or on behalf of any of the Hersha Hospitality Entities to third parties, including the press, media or to any person or other business entity with whom any of the Hersha Hospitality Entities has or is seeking a business or professional relationship, that could have an adverse impact on the business or the business reputation of any of the Hersha Hospitality Entities or of any executives, officers, principals, partners, directors, agents, employees, or trustees thereof.

## 6.    Prior Agreements.

Employee hereby represents that Employee is not bound by the terms of any agreement with any previous employer or other party that would preclude the Employee from working for the Employer.  Employee further represents that the performance of Employee's employment with the Employer and Employee's duties as an employee of the Employer does not and will not breach any agreement to keep in confidence proprietary information, knowledge or

data acquired by Employee in confidence or in trust prior to Employee's employment with the Employer. Employee will not disclose to the Employer or induce it to use any confidential or proprietary information or material belonging to any previous employer or others.

**7.    Enforcement.**

Employee acknowledges and agrees that Employee's breach of this Agreement will result in immediate and irreparable harm to the Employer. Employee further acknowledges and agrees that the remedy at law available to the Employer for any such breach of this Agreement would be inadequate and that damages flowing from such a breach may not readily be susceptible to being measured or ascertained in monetary terms. Accordingly, Employee acknowledges, consents and agrees that, in addition to any other rights or remedies which the Employer may have at law, in equity or under this Agreement, the Employer, without proof of actual damage, will be entitled to immediate injunctive relief and may obtain a temporary, preliminary and/or permanent order restraining any threatened or further breach, and that the Employer may obtain any such injunctive relief without the need to post a bond or make an application for same in connection such relief.

**8.    No Waiver.**

No failure or delay by any party in exercising any right, option, power or privilege hereunder, including failure or delay in electing to pursue any remedy with respect to any default under or breach of any provision of this Agreement or in seeking to require the performance of any provision of this Agreement, shall operate as or be deemed to be a waiver thereof or of any provision of this Agreement, any breach thereof or any remedy therefor. Acceptance by any party of any consideration due under this Agreement, with or without knowledge, shall not constitute a waiver of any provision of this Agreement.

**9.    Construction.**

The captions used herein are intended for convenience of reference only, and shall not modify or affect in any manner the meaning or interpretation of any of the provisions of this Agreement. As used herein, the singular shall include the plural, the masculine gender shall include the feminine and neuter, and the neuter gender shall include the masculine and feminine, unless the context otherwise requires. The words "hereof", "herein", and "hereunder", and words of similar import, when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision. Except as otherwise specifically described in this Agreement, the words and phrases "including", "shall include", "inclusive of" and words and phrases of similar import are deemed to be following by "without limitation" or "but not limited to."

**10.    Severability.**

(a)    Each item and provision in this Agreement is intended to be severable. If any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable for any reason whatsoever, that term or provision shall be ineffectual and void and the remainder of this Agreement shall not be adversely affected thereby.

(b)    Employee acknowledges and agrees that the provisions and restrictions in Sections 2, 3 and 4 hereof are necessary to protect the Employer's and the other Hersha Hospitality Entities' legitimate business interests, that they are reasonable in terms of duration, geographic scope and scope of the activities covered, and that they will not unreasonably interfere in Employee's ability to earn a living or pursue Employee's occupation after the end of Employee's employment. If a court of competent jurisdiction shall determine that any term or provision of this Agreement is overbroad or unreasonable in any respect (including as to geographic scope, duration, or scope of activities covered), such provision shall be given effect to the maximum extent possible by narrowing or enforcing in part that aspect of the provision found overbroad or unreasonable.

## 11.    Successors and Assigns.

This Agreement shall not be assignable by the Employee. This Agreement, and the rights of the Employer hereunder, shall be assignable by the Employer to any person, other business entity or other successor of the Employer which acquires in any manner all or substantially all of the business, assets, stock or equity interests of the Employer. The Employee hereby expressly consents to such assignment and acknowledges that no further consent by Employee to such assignment shall be necessary hereafter to effectuate such assignment. The Employee further acknowledges that Employee's obligations under this Agreement and the rights of the Employer hereunder, are for the benefit of, and protect the business interests of, the Employer, its successors and assigns, and the other Hersha Hospitality Entities.

## 12.    Applicable Law and Forum Selection.

This Agreement shall be governed by, and construed under and in accordance with, the internal laws of the Commonwealth of Pennsylvania, without regard to any conflict of law provisions.

## 13.    Complete Agreement; Amendments.

This Agreement supersedes all other agreements previously entered into among any of the parties with respect to the subject matter contained herein. No amendments or additions to this Agreement shall be binding unless made in writing and signed by all parties hereto.

## 14.    Counterparts.

This Agreement may be executed in any number of counterparts, any one of which need not contain the signatures of more than one party, by all such counterparts together will constitute one and the same agreement.

## 15.    Employment At-Will.

Employee acknowledges that this Agreement does not alter the fact that Employee's employment with the Employer is at-will, meaning that either Employee or the

Employer may terminate the employment relationship at any time for any reason, with or without cause, and with or without notice.

16.  **Knowing and Voluntary.**

Employee acknowledges and represents that Employee understands the terms and conditions set forth in this Agreement; has had adequate time to consider whether to agree to them and to consult with an attorney of Employee's own choosing if Employee desired to do so; and is signing this Agreement voluntarily and of Employee's own free will with the intent to be bound hereby.

**IN WITNESS WHEREOF**, this Agreement has been executed as of the day and year first above written.

EMPLOYEE:

Name: KIMBERLY FURLONG
Title (if applicable): VP Rev Mgmt

THE EMPLOYER:              HERSHA HOSPITALITY MANAGEMENT, LP

By: Samantha Michlovitz
Name: Samantha Michlovitz
Title: Human Resources Coordinator

**EXHIBIT B**


HERSHA

## Employment Agreement

This Employment Agreement is entered into by and between Erik McDonald (**"Employee"**) and Hersha Hospitality Management, LP (the **"Company** "and its privately held affiliates):

1. **EMPLOYMENT**

Employee will be employed on or about October 4, 2010 as EVP/Sales and Marketing for Hersha Hospitality Management. As such, Employee will perform such duties as may be specified from time to time by his immediate supervisor, provided such duties are generally consistent with duties customarily associated with those of one holding Employee's position and with Employee's background and skills, and will faithfully and competently perform such duties. Employee will perform his duties at such places and times as his immediate supervisor may from time to time reasonably prescribe.

Employee agrees and understands that his employment is at will, meaning that both Employee and Company reserve the right to terminate the employment relationship at any time, with or without cause, and with or without notice. Employee agrees and understands that no one in the Company has the authority to alter the terminable at will nature of the employment relationship other than the President of the Company, by an express and signed written agreement with Employee.

2. **COMPENSATION AND BENEFITS DURING TERM OF THIS AGREEMENT**

The Company will pay Employee a base salary at the annual rate of not less than $265,000 ("Salary"). Salary will be paid in regular intervals and in accordance with the Company's payroll practices and withholding practices from time to time in effect. Salary shall be subject to annual adjustments in the sole discretion of the Company.

Employee will be eligible to receive bonus compensation from the Company ("Bonus") of up to $40,000 in respect of each fiscal year (or portion thereof) during the term of his employment, provided that Employee must be an employee in good standing on the date that fiscal year bonuses are otherwise paid by the Company. The annual bonuses shall be based on a combination of Company performance and Employee's individual performance, relative to benchmarks mutually agreed upon by Employee and his immediate supervisor at the beginning of each fiscal year (or portion thereof). Bonus is subject to annual adjustments and is payable in the sole discretion of the Company.

Employee will be eligible to participate in any medical, dental, vision and other health or employee welfare plans that may be provided by the Company for its employees generally. Participation in such plans will be in accordance with the provisions of any such plans and programs, as the same may be in effect from time to time. Nothing contained in the Agreement shall be construed to create any obligation on the part of the Company to establish any such plan or program or to maintain the effectiveness of any such plan or program.

Employee will be entitled to paid time off (PTO) during each fiscal year pursuant to the 2010 PTO Policy, subject to annual adjustments in the sole discretion of the Company, to be taken in a manner consistent with the business interests of the Company. Upon termination of Employee's employment for any reason, Employee will be entitled to compensation for earned and unused PTO time in accordance with the terms and conditions of the 2010 PTO Policy. Employee will be entitled to reimbursement for all reasonable and necessary out-of-pocket business expenses incurred by him in the performance of his duties in accordance with the Company's policies.

3. **LOYALTY AND NONSOLICITATION**

    (a) Employee will faithfully devote his full professional time, attention, and skill to the performance of his duties for the Company. Employee agrees to honor a fiduciary duty of loyalty to the Company, and agrees not to engage in any activity during the term of

this Agreement that could in any way harm the business, business interests or reputation of the Company.  Without limiting the foregoing, during his employment with the Company, Employee will not directly or indirectly engage in competition with the Company, and Employee will not work for any other employer, including any form of part-time employment.

(b)  On the first day of his employment and continuing throughout Employee's employment, the Company will provide Employee with client lists, prospective client lists, marketing plans and strategies, business processes, information system details, employee rosters, salary information concerning other employees, pricing information, Company financial information, investment and ownership information, and other confidential information that is available only to the Company (defined in more detail below as "Confidential Information").

(c)  During his employment, Employee will experience a close business relationship with the Company's customers and employees.  Employee recognizes that the relationships that he develops with these customers and coworkers are attributable to his employment with the Company and constitute part of the valuable goodwill of the Company.  Employee agrees that, both during and following his employment with the Company, he will not interfere in any way with the goodwill of the Company.

(d)  Employee also recognizes that, because there is a limited market for the type of products and services performed by the Company, the Company faces a legitimate and significant potential for injury from competition by former employees working for competitors of the Company.  In order to facilitate the enforcement of these obligations, including but not limited to Employee's obligation to respect Confidential Information, Employee agrees that upon his separation from employment with the Company for any reason, voluntarily or involuntarily, for a period of twelve (12) months following the date of separation from employment, Employee will not, either directly or indirectly, on his own account or as an agent, stockholder, owner, employer, employee or otherwise:

(1)  solicit any business from any customers of the Company for purposes of providing products or services to those offered by the Company.  For purposes of this Agreement, the term "customers" includes those persons or entities (i) that are customers of the Company at the time of Employee's separation from employment; or (ii) are past or potential customers of the Company that Employee may have contracted or otherwise have knowledge of during his/her employment; or

(2)  contract or approach either directly or indirectly for his own individual purposes or those of another, any employee of the Company for the purpose of attempting to or actually soliciting for hire that employee on his own account, or on account of another.

4.    **CONFIDENTIAL INFORMATION**

(a)  Employee represents that there are no contracts or restrictive covenants preventing full performance of his duties hereunder and that his employment with the Company will not breach any agreement to not compete with a prior employer.  Employee represents that he will not breach any agreement to maintain the confidentiality of any information acquired in confidence or in trust prior to beginning employment with the Company.

(b)  Employee understands and agrees that any confidential and/or proprietary information that he may have from any prior employment must not be brought into the Company nor given to any Company agent or employee.

(c) During and after his/her employment by the Company, Employee agrees that he will hold all Confidential Information (as defined herein) in strictest confidence and will not, directly or indirectly, use for his own benefit or disclose any Confidential Information unless such disclosure is: (i) to an employee of the Company who has a need to know the information and is under a duty of confidentiality; (ii) authorized in writing by the Board of Directors or an officer of the Company; or (iii) required by any court or administrative agency. Employee agrees not to publish anything in the Company's business area of interest during his employment without the prior written consent of the Company. Employee must receive prior written approval from an officer of the Company prior to releasing in any magazine, book, or other forms of media, or to the press, any information related to the Company or its activities.

(d) If Employee separates from employment with the Company for any reason, Employee agrees that he will promptly (i) return all property, records, files, documents, materials and copies relating to the business of the Company which came into the possession of Employee during his employment, and (ii) destroy all such information stored on computers or disk storage not belonging to the Company. If Employee accepts new employment within one year of leaving the Company's employ, he will give written notice to the new employer of his obligations under this Agreement.

(e) For purposes of this Agreement, the term **"Confidential Information"** includes information disclosed to Employee or known to Employee as a consequence of his employment with the Company (including information developed by Employee) concerning the Company's trade secrets, designs, technological advancements, configurations, process, formulas, data and know-how, experimental or developmental work, software, manuals, guides, improvements and inventions (whether or not reduced to writing and whether or not patentable or protected by copyright) including, without limitation, the following:

   (i)    information relating to the Company's employees, their compensation, benefits, skills, performance, bargaining units, disabilities, and the Company's staffing levels and objectives;

   (ii)   actual and anticipated relationships between the Company and other companies; retention, comp structures, payroll, training, recruiting and other human resources process techniques, business forecasting and budgeting techniques, sales levels, pricing, and other unpublished financial data; marketing techniques, strategies, and plans, pricing, business projections, business plans and strategies, sales techniques, strategies and methods of conducting business;

   (iii)  information relating to the financial performance and underlying ownership information for the Company (or any of its affiliates), its properties under management, or current or potential investors in the Company (or any of its affiliates);

   (iii)  information relating to the Company's customer and vendor relationships which are not generally available to the public (including without limitation customers of the Company with whom Employee became acquainted during the term of his employment), delivery schedules, service, product pricing, quantities, existing and contemplated products, processes, and services, manufacturing procedures, systems, compositions, formulas, bids, quotations, negotiations, and contracts; and

 (vi)  confidential or proprietary information from third parties, such as customers or vendors, subject to a duty on the Company's part to maintain confidentiality and use only for certain limited purposes.

 (vii)  The term "Confidential Information" does not include any information that Employee was aware of prior to his employment by the Company, information that is a matter of public record, information contained in any document filed or submitted to any governmental entity subject to public disclosure, any information that is common knowledge in any industry in which the Company does business, or any information that is known to the Company's competitors.

## 5. VIOLATION

Employee agrees that violations of his obligations in the Agreement, either during employment or after separation from employment, will cause irreparable harm to the Company. Employee agrees that the Company has the right to enforce any of the obligations under paragraphs 3 and 4 through legal and/or equitable remedies, including but not limited to obtaining an injunction, without bond. Employee agrees to reimburse the Company for its attorneys' fees and costs incurred in pursuing enforcement of this Agreement.

## 6. GENERAL PROVISIONS

*Governing Law.* **This Agreement is made and performed in the state of Pennsylvania, and is governed by Pennsylvania law except for and without application of its choice of law and conflicts of law rules.**

*Entire Agreement.* This Agreement sets forth the entire agreement and understanding between the Company and Employee relating to the subject matter hereof and supersedes and merges all prior discussions between them. The parties have not relied on any representations, oral or written, which are not set out in this Agreement; and no previous agreement, either oral or written, will have any effect on the terms or provisions of the Agreement. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in Employee's duties, salary or compensation will not affect the validity or scope of this Agreement. As used in the Agreement, the period of Employee's employment includes any time during which he may be retained by the Company as a consultant, independent contractor or in any other capacity.

*Severability.* If any provision of the Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement will remain in full force and effect. The Company and Employee intend all provisions of this Agreement to be enforced to the fullest extent permitted by law. The invalid, illegal or unenforceable provision will be deemed to be automatically modified to the minimum extent necessary to render the provision valid, legal and enforceable, and will automatically be deemed included in this Agreement as so modified. Notwithstanding the foregoing, however, if the severed or modified provision concerns all or a portion of the essential consideration to be delivered under this Agreement by one party to the other, the remainder of this Agreement will also be modified to the extent necessary to equitably adjust the parties' respective rights and obligations.

*Successors and Assigns.* This Agreement may be assigned by the Company without the consent of Employee. This Agreement will be binding upon Employee's heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors and its assigns.

*Survival.* The provisions of this Agreement will survive the separation of Employee's employment and the assignment of this Agreement by the Company to any successor in interest or other assignee.

*Waiver.* No waiver by the Company of any breach of this Agreement will be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement will be constructed as a waiver of any other right.

EXECUTED on this ____ day of _____, 2010.

**EMPLOYEE**

Name: _____

Erik A. McDonald

**THE COMPANY**

By: _____

Mike Murray
COO

**EXHIBIT C**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Hersha Hospitality Management, L.P. :
510 Walnut Street :
Philadelphia, PA 19106 :
 :
   Plaintiff, :
 :
  v. :   CIVIL ACTION
 :
 :   NO.
The Procaccianti Group :
1140 Reservoir Avenue :
Cranston, RI 02920 :
 :
   and :
 :
Kimberly Furlong :
1148 Willow Bend Drive :
Medina, OH 44256 :
 :
   and :
 :
Erik McDonald :
27 Quail Hollow Drive :
Sewell, NJ 08080 :
 :
 :
   Defendants. :

## VERIFICATION OF LOUIS CINQUANTO, EnCE

 1. I am the Managing Member and Certified Senior Forensic Examiner of Cornerstone Legal Consultants ("Cornerstone"). Cornerstone is a technology and computer forensics consulting firm that assists clients with fact-finding in litigation.

 2. As the Managing Member and Senior Forensic Examiner for Cornerstone, I conduct and supervise digital forensic collections and investigations, advise attorneys on issues involving electronic evidence collection and preservation, and investigate spoliation and

evidence destruction issues. I am also responsible for the equipping, designing, and configuring of forensic computer hardware to optimize the leading forensic software.

3.    Prior to and during my tenure with Cornerstone, I held various positions and received substantial training in the field of computer forensics and evidence handling.

4.    From June 1996 to November 2005, I was in the United States Air Force, where I achieved the rank of Captain. Following my enlistment and later commissioning in the Air Force, I was a pilot and KC-10 Mission Commander. I was also a Local Area Network Manager and Computer Specialist for my squadron. In these positions, my responsibilities included the handling and storage of classified information for multiple Air Force operations including: Operation Iraqi Freedom, Operation Enduring Freedom and Operation Southern Watch. I also served as a pilot and mission commander in combat sorties during my service. In addition, I was responsible for aircrew training and briefing prior to deployment, and Local Area Network management for 300 end-users. Further, I implemented and monitored computer security policy; investigated internal network security breaches and provided briefing to commanders; searched hard drives for contraband; investigated cached internet activity; and designed and implemented a web-based database for Air Force Reserve member access. This database earned Benchmark status and became the framework for "Reservenet", the primary Air Force Reserve information portal.

5.    From February 2007 to February 2008, I was the National Litigation Support Manager for Buchanan Ingersoll & Rooney, P.C. In this position, my responsibilities included: the intake and processing of electronic discovery for all national offices;  working directly with attorneys to author requests for discovery, meet and confer consultations, e-discovery vendor selection and trial presentation; and presenting CLE courses internally on e-discovery matters involving the collection and presentation of evidence at trial. I was also responsible for creating

2

review databases and trial databases; presenting trial evidence in both state and federal courts; and training attorneys and legal staff in the use of review databases and trial presentation software nationally.

6.   In November 2004, I started Cornerstone Legal Consultants. At Cornerstone, I am responsible for: collecting, preserving, and examining electronic discovery; designing and administer e-discovery review databases; and provide e-discovery consultation to Federal courts, Federal agencies and the private sector. I am also a Microsoft SQL database administrator for matters involving millions of electronic files.

7.   Throughout my career, I have received certification through specialized training in the field of computer forensics, including:

- Specialized training in EnCase Computer Forensics I. This specifically involved training in the proper handling of digital evidence from the initial seizure of the computer/media to hard drive or other media acquisition; the analysis of data; and archiving and validating data.

- Specialized training in EnCase Computer Forensics II.  This specifically involved training in the location and recovery of deleted files; advanced searches using GREP; the EnCase Virtual File System (VFS), Physical Disk Emulator (PDE) and Windows® Registry; the handling of compound file types; exporting files, directories and entire volumes; the identification of files using hash values and building hash libraries; the identification of Windows XP operating system artifacts such as link files, recycle bin, and user folders; the preparation of reports and evidence for presentation in court; the recovery of artifacts such as swap files, file slack, and spooler files; and the recovery of printed and faxed pages.

- Specialized training in Advanced Internet and Email Investigations.  This specifically included training in the recovery and examination of e-mail messages, headers, and attachments from widely used e-mail applications (Outlook®, America Online®, and Netscape®) and web-based e-mail providers; and locating and examining artifacts from search engines, instant messaging clients, and newsgroups.

- Successfully completed both written and practical testing administered by Guidance Software, the creator of EnCase, the industry leading computer forensic software used by federal state and local law enforcement. Certified by Guidance as an EnCase Digital Forensic examiner.

8. I am admitted as an expert in United States Federal Courts.

9. As a Certified digital forensic examiner, I am responsible for collecting, preserving, and examining electronic discovery in both civil and criminal matters both nationally and internationally. I provide e-discovery consultation to Federal courts, Federal agencies and the privates sector, including Fortune 500 companies. I have led in the examination of hundreds of electronic storage devices including: computer and server hard drives, cell phones, thumb drives, external hard drives, iPods and cameras. I created EnCase and digital forensic training curriculum for company employees. I also design and administer e-discovery review databases, where I am a Microsoft SQL database administrator for matters involving millions of electronic files.

10. I am an Adjunct Professor at Temple University Beasley School of Law were I instruct in e-Discovery and Trial Technology.

11. I have presented as an electronic discovery and computer forensics lecturer at CLEs for: The Philadelphia Bar Association, PA Association of Criminal Defense, Federal Public Defenders CJA Panel in New Jersey and Philadelphia.

12. I was an expert computer forensic commentator for the Philadelphia Inquirer.

13. On October 5, 2011, I was contacted by David J. Walton Esq. of the law firm of Cozen O'Connor and asked to perform a forensic analysis of a Dell Latitude 13 Laptop computer, Service Tag 8LGL5L1 ("computer") that was issued to Kimberly Furlong ("Furlong") by her former employer, HERSHA Hospitality Management ("HERSHA"). Furlong discontinued use of this computer on October 4, 2011 at approximately 5:15 p.m.

14. Industry standard evidence intake procedures were completed, which include logging the serial number(s) of devices, time/date stamping the computer's motherboard, testing then attaching an EnCase FastBlock write-blocker to the target hard drive. A write-blocker

4

prevents changes to the hard drive during the preservation or imaging process. EnCase v6.16 was used to create a forensically sound mirror-image ("image") of the computer's hard drive (serial number 715DTJH7T). After the creation of the image, it was verified and determined to be an exact copy.

15. My examination of Furlong's computer began by reviewing analyzing the computer operating system's registry for the logging of external USB storage devices attached to the computer.

16. The following is a breakdown of devices attached to Furlong's computer:

**Table 1**

|  |  |
|---|---|
| USB_Flash_Memory | 0705160511370&0 |
| HPv125w | AA13073D00010143&0 |
| BlackBerry_SD | 7&4e1f839&0&CB57456C7F00B7868CCC612C71A005F0959E617B&0 |
| 2500BMV_External | 57442D57584858303837333832830&0 |
| My_Passport_0740 | 57584231413431543136383830&0 |

17. The following are dates and times these devices were last recorded in the system's registry by the operating system, Microsoft Windows 7:

**Table 2**

| | |
|---|---|
| USB_Flash_Memory | 09/21/11 01:08:10PM |
| HPv125w | 09/01/11 10:31:42PM |
| BlackBerry_SD | 09/06/11 06:49:26PM |
| WD 2500BMV_External | 10/03/11 03:43:23PM |
| My_Passport_0740 | 09/03/11 03:50:41PM |

18. Based on supporting evidence when comparing file access times to the above chart (Table 2), it is this examiners opinion that they likely represent the date and time these devices were last inserted into the computer, not removed. The registry has also recorded some of these

external storage devices as being assigned the volume letter "D" or D-drive. The Western

Digital WD 2500BMV_External drive ("external hard drive") was the last device to be assigned

the Volume letter "D".

19. An analysis was done to determine if any computer files were accessed on the

external hard drive, on or before 10/03/11 and point to the "D-drive". In the absence of the

external drive, a method is to search for link files on the computer's hard drive that point to this

device. A link files is a symbolic link or shortcut to a target file which resides in another

location on a computer's hard drive. One example of this is a shortcut on a user's desktop. By

clicking on this link, it opens a remote file or document using the appropriate application. These

link files are either created by the user or the operating system. Operating system link files are

located in places such as the "Recent Documents" menu option found in the Windows Start

menu.  These link files provide useful information about the target file, including last accessed

or opened.

20. The external hard drive was apparently inserted into the computer on 10/03/11 at

approximately 03:43:23PM and assigned the volume letter "D". The above link files show files

being accessed on this drive after 03:43:23PM. A limitation of links files is it is created only

when a file is opened. It will not track copying of files to an external hard drive.

21. Any file that is accessed while an external drive is connected can be an indication of

copying to that device; however it cannot be determined unless the device is inspected. The user

accessed many user files while the drive was connected. In fact, all of the above USB drives in

Tables 1 and 2 could have possibly been used to copy HERSHA documents. Some of these

devices were last inserted into the HERSHA computer months before Furlong's separation from

the company. Without inspecting all of the devices in these tables, it is impossible to determine

exactly which HERSHA files were copied.

22. Examiners will often attempt to determine if files are being copied by analyzing patterns in computer files access times. If many files are accessed at the exact same time (hour minute and second) it may indicate file access for the purpose of copying. This "machine gun" access was observed multiple times on 10/3/2011 after the external drive was plugged in by Furlong. Based on my experience, this is type of access is indicative of copying.

23. It was also noted that Furlong accessed HERSHA's network remotely several times while the external hard drive was connected on 10/3/2011. One remote login time of particular note was:

**Table 4**

| Username | IP Address | Net | Net | Date | Auth |
|---|---|---|---|---|---|
| Kimberly.Furlong | 10.1.2.117 | ht001-lt002.hersha.net | PHL-CORE1.hersha.net | Oct 03,2011 03:42:28 PM | Success |

24. This demonstrates Furlong logged onto the company network and seconds later connected the external hard drive. While this fact alone may seem innocuous, given the context, it may be indicative of possible attempts to copy data. Since the network is accessed by many people, the network-based files' access times are constantly being updated by many users accessing files.

25. On October 11, 2011 at 7:45 am, Ms. Furlong delivered the external hard drive to this examiner at HERSHA's office at 510 Walnut Street, Philadelphia, PA., and a chain of custody was started.

26. Furlong stated to this examiner that this external hard drive was used for personal storage and to back up her computer. It is not known what computer (personal or other) was meant by this statement.

27. After taking possession, intake procedures were completed. The serial numbers of the physical drive was compared to the drive recorded by the HERSHA computer's operating system, most recently on 10/3/2011. These numbers matched. A forensic image of the drive was completed using EnCase v6.16 while connected to a Tableau USB forensic bridge write-blocker to maintain the integrity of the evidence.

28. This examiner computed MD5 hash values[1] for all work-product contained on the HERSHA computer. Work-product was defined for this search as any document (Microsoft ® Word®, Excel®, Adobe® PDF, etc.) that was written for a human reader. This same MD5 hashing process was accomplished for the files contained on the external hard drive. The laptop hash values were de-duplicated. De-duplication is a standard forensic process where multiple instances of the same document is removed leaving a set of unique documents. The result was 7840 unique work product documents.

29. When this unique set from the computer was compared to the external hard drive, 1314 documents were identical. This means that there were 1314 instances of the HERSHA laptop documents on the external hard drive. The 1314 external hard drive documents were then de-duplicated. The result was 1144 unique files that existed on the HERSHA laptop existed on the Furlong external hard drive. Many of which had HERSHA in the file name and/or path.

30. A search was completed on the on the external hard drive to determine which files and folders were accessed after Furlong returned the computer to HERSHA. Copying is one method that updates last accessed time. Using "On or After October 5, 2011," as the criteria for the search, 47 hits were returned. Among these hits were both files and folders. The hit dates

---

[1] MD5 hashing utilizes a mathematical algorithm that represents a unique value for a given set of data, similar to a digital fingerprint. It enables exact copies of files to be identified. ***The Sedona Conference Glossary - E-Discovery & Digital Information***.

ranged from October 5 through October 7, 2011. The HERSHA computer was not used for this access, as it was returned to HERSHA on October 4, 2011.

31. On October 7, 2011, there was a folder accessed called, "HERSHA". This folder contains over 10,854 files and sub-folders and 11,390 instances of the stand-alone word "HERSHA" in both the metadata[2] and documents' content. If the HERSHA folder was copied from the external drive to another storage device, the HERSHA folder's last accessed time would reflect the date of the copy and the content of this folder (10,854 files and sub-folders) would not be updated or changed. Therefore, if the folder and contents were copied, you would only know based on the parent folder's last accessed time. Since this is a FAT32 external hard drive, we don't know the exact time of the access, only the date. A full examination of all of the computers and external storage devices in the possession of Furlong is necessary to know what files may have been copied from the external hard drive.

32. There was no evidence to support the HERSHA or any other folder was a back-up of the HERSHA laptop. The hash comparison and analysis of the structure of the content did not support the previous statement made by Furlong on October 11, 2011. Back-ups typically mirror the structure of folders and files on the device you are backing-up. This was not the case when analyzing Furlong's external hard drive. Additionally, it appeared as though the external drive contained more HERSHA work product than the HERSHA laptop.

33. In the course of this investigation, This examiner was asked to analyze a HERSHA issued Dell Latitude13, service tag 5DGL5L1 and hard drive serial number 5VG9R9JQ. This computer was issued to employee Erik McDonald. This investigation is still ongoing; however several entries in the Windows 7 operating system's registry have been noted. It appears that the

---

[2] Metadata is defined as the properties about the file stored in the file, as opposed to document content. (**_The Sedona Conference Glossary - E-Discovery & Digital Information_**).

9

identical external hard drive identified in this affidavit (Tables 1 & 2, 2500BMV_External, serial number 57442D575848583038373338323830) and admittedly owned Furlong was plugged-in to Erik McDonald's computer on July 22, 2011. Further investigation is required to determine why Furlong's hard drive was plugged into Erik McDonald's computer and what data was possibly transferred.

34. Table 1 also references the Windows operating system creating a registry entry for a Blackberry device being plugged into the computer's USB port on 9/6/2011. Blackberry devices are capable of making and receiving telephone calls, sending and receiving email and text messages, and browsing the internet. They also contain SD memory cards capable of storing hundreds of thousands of documents in its memory. When connected to a computer, it is capable of functioning exactly like an external hard drive. This investigator is unaware of any HERSHA Blackberry being issued to Furlong.

35. The potential number of documents transferred from HERSHA assets and still on Furlong devices could be significant. Unless all USB devices identified in Tables 1 & 2 are examined, as well as any other storage devices, online repository and computers in the custody of Furlong are submitted for examination, the true risk, exposure or damage to HERSHA will be unknown.

10

I, verify that the foregoing is true and correct to the best of my knowledge, information and belief, and that the statements above are made subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsifications to authorities.

Louis Cinquanto, EnCE

Dated:  October 17, 2011

11