# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Hersha Hospitality Management, L.P.          :
510 Walnut Street                            :
Philadelphia, PA 19106                       :
                                             :
                 Plaintiff,                  :
                                             :
         v.                                  :          CIVIL ACTION
                                             :
                                             :          NO. 11-CV-6474
The Procaccianti Group                       :
1140 Reservoir Avenue                        :
Cranston, RI 02920                           :
                                             :
         and                                 :
                                             :
Kimberly Furlong                             :
1148 Willow Bend Drive                       :
Medina, OH 44256                             :
                                             :
         and                                 :
                                             :
Erik McDonald                                :
27 Quail Hollow Drive                        :
Sewell, NJ 08080                             :
                                             :
         and                                 :
                                             :
David Singer                                 :
5418 Riverboat Way                           :
Fairfax, VA  22032                           :
                                             :
         and                                 :
                                             :
Alan Swerdloff                               :
34 Linda Street                              :
Lincoln, RI  02865                           :
                                             :
                                             :
                 Defendants.                 :

## FIRST AMENDED COMPLAINT

Plaintiff, Hersha Hospitality Management, L.P. ("HHM"), by its attorneys, brings the following civil action against Defendants The Procaccianti Group ("TPG"), Kimberly Furlong ("Furlong"), Erik McDonald ("McDonald"), David Singer ("Singer"), and Alan Swerdloff ("Swerdloff")[1] (collectively, "Defendants"), and avers as follows:

## INTRODUCTION

This case presents the Court with claims punctuated by a web of betrayal and deception. McDonald and Furlong were two HHM key employees who suddenly resigned from HHM to work for a competitor, TPG. Before doing so, they recruited two other key employees, Swerdloff, and Singer, – with TPG's inducement – to leave with them *en masse*. In doing so, McDonald and Furlong clearly violated their contractual and fiduciary duties owed to HHM. When confronted with this evidence, however, both McDonald and Furlong misled HHM about their involvement. HHM's internal investigation reveals that McDonald was the "ring leader." He previously worked for TPG.

Unfortunately, the deception goes even further. McDonald and Furlong both misled HHM about using external USB memory devices on their HHM laptops. HHM's computer forensic examination reveals that McDonald and Furlong shared a Western Digital 250GB external drive, which Furlong accessed with an unknown computer as late as October 7, 2011. As a result, McDonald and Furlong potentially took thousands of files from HHM, many of which contain HHM's incredibly sensitive and confidential information.

Based on this information, HHM filed a complaint initiating this action on October 17, 2011. HHM, however, continued its forensic investigation by examining the laptop computers formerly used by Singer and Swerdloff during their employment at HHM. Disturbingly, this continued examination revealed additional evidence of potential – yet extensive – theft of

---

[1] At times, McDonald, Furlong, Singer, and Swerdloff may be collectively referred to as "Individual Defendants."

HHM's confidential and important information. In fact, the forensic examination revealed that at least five different portable media devices were used on Singer's HHM laptop even though HHM employed him for only a few months. For Swerdloff, the examination revealed that two external hard drives were used on his computer, one of which contained back-up software that would enable him to make a mirror image of another computer on the portable drive. The examination further revealed that one of the drives used on Swerdloff's laptop had extensive amounts of HHM's highly confidential information and trade secrets.

HHM is now faced with the very real and concerning possibility that its direct competitor, TPG, has access to its most important competitive secrets and strategies. Upon information and belief, TPG encouraged this conduct by offering the former HHM employees substantial raises in a blatant effort to harm HHM by raiding its top managers and by inducing them to commit wrongs.

This is a case that needs immediate Court intervention to halt Defendants' unlawful conduct and to help HHM recover its lost information. HHM is seeking damages for the substantial harm that has occurred, and will continue to occur, before Defendants' illegal conduct is enjoined.

## NATURE OF THE ACTION

1.    This is an action arising from Defendants' unlawful misappropriation, use, and/or disclosure of HHM's trade secrets and other confidential information in violation of Pennsylvania common law and statutory law, 12 Pa. Cons. Stat. § 5301, *et seq*. This action further concerns Furlong's, Singer's, and Swerdloff's violations of 18 U.S.C. § 1030, the Computer Fraud and Abuse Act, the Individual Defendants' breach of their respective confidentiality and non-solicitation agreements, the Individual Defendants' violations of the duty of loyalty, and Defendants' misappropriation of HHM's corporate and business opportunities.

2.      HHM is seeking to enjoin Defendants' from engaging in further conduct that would be detrimental to HHM.

3.      HHM is seeking to recover the damages it has suffered and will continue to suffer as a result of Defendants' unlawful conduct.

## PARTIES AND VENUE

4.      Plaintiff HHM is a corporate entity that is headquartered at 510 Walnut Street, 9th Floor, Philadelphia, Pennsylvania 19106.

5.      Defendant TPG is a corporate entity that is headquartered at 1140 Reservoir Avenue, Cranston, Rhode Island 02920.

6.      Defendant Furlong is an adult individual who resides at 1148 Willow Bend Drive, Medina, Ohio 44256.

7.      Defendant McDonald is an adult individual who resides at 27 Quail Hollow Drive, Sewell, New Jersey 08080.

8.      Defendant Singer is an adult individual who resides at 5418 Riverboat Way, Fairfax, Virginia 22032.

9.      Defendant Swerdloff is an adult individual who resides at 34 Linda Street, Lincoln, Rhode Island 02865.

10.      Subject matter jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332. Plaintiff HHM is a corporation with residence in Pennsylvania, the state where it is headquartered and the state within which it is incorporated.  Defendant McDonald is a resident of New Jersey.  Defendant Furlong is a resident of Ohio.  Defendant Singer is a resident of Virginia.  Defendant Swerdloff is a resident of Rhode Island.  Defendant TPG is a corporation with residence in Rhode Island, the state where it is headquartered and the state within which it is

incorporated. Accordingly, complete diversity exists among Plaintiff HHM and all Defendants. The amount in controversy exceeds $75,000.

11.     Subject matter jurisdiction in this Court is also proper pursuant to 28 U.S.C. § 1331, as Count XI arises under 18 U.S.C. § 1030, the Computer Fraud and Abuse Act. This Court has supplemental jurisdiction over the remaining counts, which arise under Pennsylvania state law, pursuant to 28 U.S.C. § 1367(a), as all claims in this matter are related and "form part of the same case or controversy."

12.     Venue in this forum is appropriate pursuant to 28 U.S.C. §1391(b)(2). The majority of acts giving rise to this Complaint occurred in locations encompassed by the Eastern District of Pennsylvania.

## FACTUAL ALLEGATIONS
### Furlong's and McDonald's Employment with HHM

13.     HHM provides hotel and asset management services for properties in New York, Massachusetts, Connecticut, New Jersey, Pennsylvania, Delaware, Virginia, Washington D.C., Rhode Island, Georgia, Florida, North Carolina, and California.

14.     HHM is affiliated with major hotel brands, including Marriott, Starwood, Hilton, Hyatt, and Intercontinental.

15.     HHM employees are led by its Chief Executive Officer, Naveen Kakarla, and its Chief Operating Officer, Michael Murray ("Murray").

16.     Furlong and McDonald were employed by HHM from November 2010 and October 2010 respectively, until Friday October 7, 2011. At the outset of their employment, each signed confidentiality agreements agreeing not to disclose any confidential and/or trade secret information that they receive, and/or to which they gain access, while employed with HHM. *See* Exhibit A and Exhibit B.

17.     Furlong's and McDonald's jobs were closely intertwined with HHM's core business functions.  Their jobs provided exposure to all types of HHM's confidential proprietary business information, including customer and rate lists.  Furlong and McDonald also had access to extremely confidential and sensitive information related to pricing and rate strategy, documents pertaining to how HHM structures agreements with its accounts, and proprietary tools designed to help HHM outperform its competitors.  Access to even one set of these documents would be detrimental to HHM, but priceless for a competitor.

18.     Furlong and McDonald also executed agreements where each agreed not to encourage or solicit HHM employees to join a competitor.

19.     Furlong and McDonald were HHM's two most senior and experienced employees in the areas of sales and revenue.  Each had dozens of direct reports, and even more subordinates.

20.     Furlong joined HHM in November 2010.  She served as HHM's Vice President of Revenue Management.  In this position, she was directly responsible for leading the strategic vision for room pricing and inventory distribution for all of HHM's hotels.  She led an organizational network of Regional Directors and Area Directors for Revenue Management.

21.     McDonald joined HHM in October 2010.  He served as HHM's Executive Vice President of Sales and Marketing.  In this position, he was responsible for the development and execution of the company's strategy on driving revenue to HHM managed hotels.  McDonald actively managed HHM's marketing initiatives, direct field sales deployment, revenue management, and e-Commerce initiatives.

22.     Before joining HHM, McDonald worked for TPG.

23.     Furlong's and McDonald's roles were fundamental to HHM's success, as each individual was involved intimately in overseeing and actively managing the revenue and sales at HHM managed hotels.

## McDonald's and Furlong's Confidentiality and Non-Solicitation Agreements

24.    The hotel industry is a highly competitive industry in which trade secrets and confidential material are guarded closely.

25.    Companies like HHM scrutinize a hotel's business before acquisition, and maintain close surveillance of similar information after acquisition.

26.    Employees, like Furlong and McDonald, who work on revenue and sales are exposed to their employer's most confidential and sensitive documents relating to strategy. These employees also have access to programs that are specifically designed to allow a hotel company to outperform its competitors.

27.    As a result, violation of these types of agreements can be devastating to a company in the hotel industry, because departing employees can take the information and key employees essential to a hotel company's success.  This is especially true when the employees leave to join a competitor.

28.    Consistent with industry practice, HHM requires employees at the senior management level to sign non-solicitation and confidentiality agreements.

29.    Furlong and McDonald both signed these types of agreements in conjunction with the start of their employment with HHM.

30.    At the start of her employment at HHM, Furlong signed a "Confidentiality, Non-Solicitation, and Non-Piracy Agreement" (the "Furlong Agreement") (a copy of the Furlong Agreement is attached as Exhibit A).

31.    The Furlong Agreement contains non-solicitation and confidentiality provisions.

32.    The clause related to non-solicitation of employees states:

> "Employee agrees that during the Non-Solicitation Period [defined as "during the Employee's employment with the Employer . . . and for a period of one (1) year following the effective date of the termination of Employee's employment"], Employee will not, without the prior written consent of the Employer, directly or

indirectly, on the Employee's own behalf or on behalf of any person or entity, in any manner (a) actually or attempt to hire, recruit, or solicit for hire any employee of the Hersha Hospitality Entities *who was an employee during the six month period prior to the Employee's termination of employment with the Employer*, or (b) solicit, influence, or attempt to influence, encourage, persuade or induce any current employee of the Hersha Hospitality Entities to terminate employment with any of the Hersha Hospitality Entities who was an employee during the six month period prior to the Employee's termination of employment with the Employer."

Exhibit A at ¶¶ 3(c), 4.

33.    Furlong similarly agreed not to solicit current or prospective HHM clients for one year following termination of her employment.  Exhibit A at ¶ 3(c).

34.    In the same agreement, Furlong also agreed that "both during the Employee's employment with the Employer and after its termination, the Employee will keep in confidence and trust all such Confidential Information, and will not, either directly or indirectly, at any time, while an employee of the Employer or thereafter, make known or disclose, reveal, furnish, make available, or use . . . any Confidential Information without the prior written consent of the Employer."  Exhibit A at ¶ 2(b).

35.    The Furlong Agreement defines "Confidential Information" as information "which relates to the Employer or other Hersha Hospitality Entities, is not generally known to the public or in the trade, is a competitive asset . . . or [is information] the disclosure of which could result in a competitive or other disadvantage to the Employer or any of the other Hersha Hospitality Entities."  Exhibit A at ¶ 2(a).

36.    In the event of termination, Furlong further agreed that "[a]ll documents, records, files, computer files, data, apparatus, equipment and other physical property, including all such materials in any form that constitute or contain Confidential Information . . . will be and remain the sole property of the Employer and shall be returned to the Employer . . . . The Employee will not retain in Employee's possession, custody or control any such material or property or any

8

copies thereof after termination of Employee's employment or a request by the Employer for the return of such material or property." Exhibit A at ¶ 2(c).

37.     Like Furlong, at the start of his employment at HHM, McDonald signed an employment agreement (the "McDonald Agreement") (a copy of the McDonald Agreement is attached as Exhibit B).

38.     The McDonald agreement contains non-solicitation and confidentiality provisions.

39.     As related to the solicitation of HHM employees, McDonald agreed that "for a period of twelve (12) months following the date of separation from employment" he would not "contract or approach either directly or indirectly for his own individual purposes or those of another, any employee of the Company for the purpose of attempting to or actually soliciting for hire that employee on his own account, or on account of another." Exhibit B at ¶ 3(d)(2).

40.     The importance of HHM's confidential information also is recognized in the McDonald Agreement.  The McDonald Agreement states, "If the employee separates from employment with the company for any reason, Employee agrees that he will promptly (i) return all property, records, files, documents, materials and copies relating to the business of the Company which came into possession of Employee during his employment . . . ." Exhibit B at ¶ 4(d).

41.     McDonald further agreed to "honor a fiduciary duty of loyalty to the Company, and . . . not to engage in any activity during the term of this Agreement that could in any way harm the business, business interests or reputation of the Company . . . . Employee will not directly or indirectly engage in competition with the Company, and Employee will not work for any other employer . . . ." Exhibit B at ¶ 3(a).

42.    Finally, McDonald agreed that "both during and following his employment with the Company, he will not interfere in any way with the goodwill of the Company." Exhibit B at ¶ 3(c).

### Singer and Swerdloff's Employment with HHM

43.    Singer was employed by HHM from July 6, 2011 until October 14, 2011. Singer was a Regional Director of Revenue Management at HHM, and worked under Furlong and McDonald.

44.    Swerdloff was employed by HHM from May 16, 2011 until October 18, 2011. Swerdloff was a Regional Director of Sales at HHM. He worked directly under McDonald.

45.    Prior to working for HHM, Swerdloff worked for TPG. He was managed by McDonald.

### Singer's and Swerdloff's Confidentiality Agreements

46.    At the start of his employment at HHM, Singer signed a "Confidentiality, Non-Solicitation, and Non-Piracy Agreement" (the "Singer Agreement") (a copy of the Singer Agreement is attached as Exhibit C).

47.    At the start of his employment at HHM, Swerdloff signed a "Confidentiality, Non-Solicitation, and Non-Piracy Agreement" (the "Swerdloff Agreement") (a copy of the Swerdloff Agreement is attached as Exhibit D).

48.    The Singer Agreement and the Swerdloff Agreement are identical to the Furlong Agreement, and contain the same confidentiality and non-disclosure provisions.

### McDonald and Furlong suddenly resign from HHM

49.    On Monday, September 19, 2011, McDonald and Furlong each received written employment offers from TPG, both of which were amended on September 20, 2011.

50.     On Wednesday, September 21, 2011, Furlong and McDonald executed their offers of employment from TPG.

51.     On Friday, September 23, 2011, McDonald informed HHM, during a meeting with HHM's Chief Operating Officer, Murray, that he was resigning from HHM to go back to TPG.  He also stated that Furlong was resigning from HHM to accept a position with TPG as well.  Murray asked McDonald to reconsider and to spend the weekend thinking about whether there was anything HHM could do to encourage him to stay.

52.     The two companies are both hotel management firms and direct competitors.  They actively compete in several geographic areas.  McDonald and Furlong's deep knowledge about HHM's sales and management strategies, as well as knowledge about HHM's efforts to sell into a specific market would be of great value to a competitive company with hotels in the same areas, i.e., a company just like TPG.  The two companies also manage properties for the same hotel brands.

53.     Neither Murray nor any other employees at HHM were aware that Furlong was resigning prior to learning that information from McDonald.

54.     Indeed, Murray was shocked by these resignations.  Both Furlong and McDonald were important employees and vital to the company's success.

55.     Furlong's resignation was particularly surprising because she had not worked for HHM for a full twelve-month period.  According to Furlong's employment agreement, if she did not work at HHM for at least one full year, she would be obligated to repay her relocation bonus of $10,000.

56.     Because he was shocked by her resignation and received the notice through McDonald, Murray e-mailed Furlong and requested an in-person meeting.  Furlong and Murray agreed to meet on Sunday, September 25, 2011.

57.     At the September 25 meeting, Furlong said she intended to resign.

58.     Furlong was such an important employee, and so well respected, that Murray offered to do whatever it would take to keep her at HHM.  Furlong said she would consider this offer.

59.     At separate meetings, the following morning, Monday, September 26, 2011, Furlong and McDonald each rejected Murray's offer and confirmed their decisions to join TPG. They agreed to stay on with HHM until October 21, 2011.

60.     Hours after turning in his resignation, McDonald informed Murray that Betty Procaccianti ("Procaccianti") at TPG intended to immediately announce to everyone at TPG that they hired McDonald and Furlong.  Murray then immediately contacted Procaccianti to facilitate a smooth transition.

61.     Procaccianti is TPG's Chief Operations Officer.

62.     Murray told Procaccianti that he did not want McDonald's and Furlong's hiring with TPG to be public for a few weeks, because they were staying at HHM until October 21.

63.     But, Procaccianti ignored Murray's request; TPG announced McDonald's and Furlong's hiring that same night.

64.     Faced with TPG's refusal to delay their announcement, Murray announced Furlong's and McDonald's resignations at a morning meeting on September 27.

65.     A series of events over the next few days made HHM even more alarmed about the departures of McDonald and Furlong.

**Singer, HHM's Regional Director of Revenue Management, suddenly resigns from HHM and joins TPG after McDonald and Furlong pressured him to accept TPG's offer.**

66.     Furlong and Singer attended a breakfast together on Thursday, September 29, 2011 after Furlong already decided to resign from HHM.  Upon information and belief, McDonald was also at the breakfast.

67.     Singer's offer letter from TPG is dated September 29, 2011.  The letter also indicates that Singer will report to the Vice President of Revenue Management, the same position Furlong held while at HHM.  Upon information and belief, Singer will report to Furlong at TPG, just like he reported to Furlong while at HHM.

68.     The same day, Singer telephoned Jillian Dunn ("Dunn"), a Human Resources Manager at HHM.  He told her that TPG also made him an offer of employment.

69.     At the time he received this offer of employment, Singer did not know anyone currently working at TPG.

70.     Upon information and belief, Singer's only connection to TPG was through Furlong and McDonald.

71.     Despite this offer, Singer told Dunn that he wanted to stay at HHM.

72.     Singer specifically asked Dunn about applying for Furlong's former position (Vice President of Revenue Management).  He also asked Dunn if the company would look internally or externally to fill the role.

73.     Dunn encouraged Singer to speak with Murray about the position.

74.     Because Dunn wanted Singer to be considered for the Vice President position, she called Singer the very next day to follow-up on their previous conversation.

75.     During this call, Singer told her that he already spoke with Murray about the Vice President position.

76.     Singer told Dunn that his conversation with Murray was "extremely helpful" and that he looked forward to meeting with Murray in person on Tuesday, October 4, 2011.

77.     Murray ended the conversation feeling good about Singer's commitment to HHM.

78.     In fact, Singer applied for the Vice President of Revenue Management position on Saturday, October 1, 2011.

79.     Shockingly, on Monday, October 3, 2011, Singer resigned from HHM to accept a position with TPG.

80.     Dunn immediately contacted Singer.  She expressed her confusion about his decision to join TPG, when – only two days earlier – he applied for the Vice President position at HHM.

81.     In response, Singer told Dunn that both Furlong and McDonald pressured him to make a decision about the job at TPG that day.  As a result of this pressure, Singer felt forced to accept TPG's offer.

82.     Although Singer had accepted the TPG offer, he agreed to speak with Murray the next day about the available Vice President position at HHM.

**Swerdloff, HHM's Regional Director of Sales, suddenly resigns from HHM and joins TPG.**

83.     After McDonald announced his resignation, Murray called Swerdloff to discuss any concerns he had about McDonald's departure.  During this call, Swerdloff never mentioned that he had an offer from TPG or that he might leave HHM.

84.     However, on October 3, 2011 – the very same day that Singer resigned – Swerdloff also resigned from HHM to accept an offer from TPG.

85.     Upon giving their resignations, McDonald, Furlong, Swerdloff, and Singer all agreed to continue their work at HHM until October 21, 2011.  However, the investigation described below resulted in early resignations by McDonald, Furlong, and Singer.

**HHM investigates the sudden resignations of the four key employees.**

86.     On October 4, 2011, HHM management met separately with Furlong, McDonald, Swerdloff, and Singer.

87.     First, Joann Weber ("Weber"), Vice President of Human Resources, met with Swerdloff.  He told Weber that TPG offered him a position on Monday, September 19, 2011. This is the same day that McDonald and Furlong received their written offers from TPG.

88.     Weber then met with Singer.  He admitted that Furlong was the one who gave him the offer to join TPG.  He explained to Weber that he was "floored" when Furlong made the offer to join TPG, because she offered him 20% more money than he was making at HHM.

89.     This statement is direct evidence that Furlong violated her non-solicitation agreement with HHM.

90.     At least three times during his meeting with Weber, Singer reiterated that he accepted the TPG offer on October 3, 2011 because Furlong and McDonald pressured him to make an immediate decision.

91.     These meetings make it clear that Furlong and McDonald were working with TPG to hire away both Swerdloff and Singer.

92.     Since this meeting with Singer, Singer informed HHM that he will be working for TPG at a competitive hotel in Alexandria, Virginia, the same market in which he worked for HHM.  Furthermore, Singer told HHM that he only will be working on revenue management for two hotels managed by TPG, both of which are in cities that HHM also manages hotels.

93.     On October 4, 2011, Murray and Weber also confronted McDonald and Furlong regarding their involvement in hiring Singer and Swerdloff.

94.     Murray and Weber met separately with McDonald and Furlong.

95.     Murray and Weber first met with McDonald.

96.     Murray directly asked McDonald if he had any knowledge about Singer's offer at TPG.

97.     McDonald denied doing anything to solicit or recruit Singer.  This claim was directly contradicted by Singer, who specifically told HHM that both McDonald and Furlong pressured him to join TPG.

98.     McDonald, however, conceded that Furlong was involved in hiring Singer.  In fact, he indicated that Furlong was responsible for Singer's decision to join TPG.

99.     Similarly, McDonald claimed that Swerdloff applied for his job at TPG on his own, and he was not involved in recruiting Swerdloff.  McDonald's own email communications belie this claim.

100.    Based on McDonald's questionable conduct, Murray advised McDonald that he was placed on immediate leave pending the company's investigation.

101.    After this meeting, while Weber waited with McDonald in his office for HHM's technology department to arrive, McDonald furiously typed on his handheld device.  Upon information and belief, he was sending texts and/or e-mails to Furlong to warn her before she met with Murray and Weber.

102.    After their meeting with McDonald ended, Murray and Weber immediately met with Furlong.

103.    During this meeting, Furlong admitted that she spoke to at least "seven" HHM employees who expressed an interest in joining TPG.  Furlong advised these employees to go to TPG's employment site and apply on-line.

104.    She also admitted that she helped Singer find a job at TPG.

105.    Further, Furlong stated that she could do whatever she wanted and denied having any restriction on solicitation or a related agreement; to the contrary, she explicitly signed the Furlong Agreement.

106.    Furlong did not appear concerned about the continuing obligations in the Furlong Agreement, even after being reminded about the agreement and seeing a copy of the agreement.

107.    Murray reminded Furlong that this restrictive covenant was critical because earlier in the conversation she admitted to helping HHM employees, including Singer, search for work at TPG.

108.    As Furlong well knew, and as Murray reminded her, helping HHM employees obtain employment at TPG would be in direct violation of her non-solicitation agreement.

109.    Murray and Weber concluded the meeting by telling Furlong that she too would be placed on leave during HHM's investigation.

**Despite McDonald's assurances that he was not involved in Swerdloff's hiring for TPG, his own communications with Swerdloff reveal a different story.**

110.    On October 3, McDonald and Swerdloff exchanged a series of emails.

111.    Swerdloff emailed McDonald about his resignation date from HHM.  McDonald responded that Swerdloff should indicate October 21, and, in the future, act as if McDonald did not know about the resignation.

112.    McDonald's attempt to hide his involvement with Swerdloff's resignation – in combination with his attempt to hide his involvement in Singer's departure – indicates that he likely played a larger role in recruiting and hiring away Swerdloff than he admits.

**While still being paid to work at HHM, McDonald actively engaged in extensive strategic and business communications with TPG employees while using HHM's computers.**

113.    In addition, HHM's investigation into Furlong's and McDonald's work e-mail accounts revealed that despite still being HHM employees, Furlong and McDonald had extensive communications, on HHM's own e-mail server, with TPG employees about HHM's business strategy and how that impacted TPG's competing business strategy.

114.    Starting on September 27, 2011, McDonald – while still working at HHM – sent and received multiple emails from TPG employees regarding TPG's business strategy.

115.    On September 27, 2011, McDonald received multiple property performance reports, on his HHM e-mail account, from Michael Brown at TPG companies.

116.    On September 28, 2011, McDonald received an email from Lisa Hugo at TPG, which contained a detailed list of TPG's property contacts and sales vacancies.

117.    On October 3, 2011, McDonald received an email from Stephen Gordon at TPG.

118.    This email contained detailed information about an acquired hotel in Albany, New York, including that the hotel name needed to incorporate "Albany," how to incorporate "Albany" into the hotel website, and using "a '301 redirect' strategy from the old site to the new site . . . [as this] will at the very least ensure that not all is lost from our past SEO efforts." These are just some of the communications that McDonald had with TPG employees about competitive business issues while he still was working for HHM.

119.    These communications demonstrate that McDonald was actively working for TPG while he still was actively employed and being fully paid by HHM.

120.    Upon information and belief, McDonald's efforts for TPG regarding the development of business strategy coincided with his apparent efforts to recruit and lure away Singer and Swerdloff — all while he was still employed by HHM.

121.    This conduct is a fundamental and clear breach of McDonald's fiduciary duties that McDonald owed to HHM as an active HHM management employee.

**Just like McDonald, Furlong actively communicated with TPG employees regarding competitive business issues while she still was working for HHM.**

122.    Starting on September 29, 2011, Furlong sent many emails to TPG employees. She received many emails from TPG employees as well.

123.    For example, on October 3, 2011, Furlong received an email from Hilton Worldwide in Memphis about a specific American Express Weekend offer.

124.    Furlong, in turn, forwarded this email to more than 15 HHM employees, and discussed in that email how "Hilton failed to communicate this non-LRA program . . . which means it's highly likely its available for sale when we don't need it."

125.    Still a HHM employee, Furlong had a continuing duty of loyalty to HHM.

126.    Instead of acting in a manner loyal to HHM, Furlong wanted to ensure that her new company, TPG, also was aware of this important information.

127.    As a result, Furlong forwarded both the HHM email containing HHM strategy and the email from Hilton to Michael Brown at TPG asking, "Can you help us make sure this didn't negatively impact TPG anywhere?  Especially Hilton NYC.  Thanks!"

128.    This e-mail is just one example of Furlong's attempt to wear two hats at the same time.

129.    In fact, in this same email string, Furlong specifically states to McDonald:  "I know you don't care about Hersha.  Neither do I."  She also expressed her continued loyalty to him.

130.    This communication confirms that, while they were being paid by HHM, McDonald and Furlong were acting inimically toward HHM's interests.

131.    Furlong had several, similar other communications with TPG employees.

132.    In the days following her resignation, Furlong played both sides of the fence:  she put on a front of working for HHM, only to secure additional information from HHM to benefit TPG.

133.    These communications demonstrate that Furlong was actively working for TPG while she still was actively employed and fully being paid by HHM.

134.    Upon information and belief, Furlong's efforts for TPG regarding the development of business strategy coincided with her apparent efforts to recruit and lure away Singer and Swerdloff – all while she still was employed by HHM.

135.    This conduct is a clear breach of the fiduciary duties that Furlong owed to HHM as an active HHM management employee.

**TPG's employment offers to the former HHM employees included substantial compensation that was above market and motivated by a specific intent to raid HHM.**

136.    TPG offered substantial compensation increases to McDonald and Furlong. Upon information and belief, TPG offered above-market compensation levels to McDonald and Furlong in a blatant attempt to induce them to solicit additional employees and commit other wrongs.

137.    Upon information and belief, Defendants also offered Singer and Swerdloff substantial increases in compensation to induce them to leave HHM and join TPG.

138.    Upon information and belief, TPG offered these above-market compensation levels to harm HHM by luring away key employees and inducing them to commit wrongs.

**HHM's forensic analyses of McDonald's and Furlong's computers show extensive flash drive and external hard drive use under suspicious circumstances.**

139.    At the October 4, 2011 meetings, Furlong and McDonald denied ever having used portable USB drives on their HHM laptops.

140.    HHM hired a computer forensic consultant to analyze the HHM laptops used by McDonald and Furlong. *See* Affidavit of Louis Cinquanto, EnCe (a copy of Louis Cinquanto's affidavit is attached as Exhibit E).

141.    Contrary to Furlong's and McDonald's denials, this forensic analysis revealed strong evidence that portable USB-memory devices were used on both computers, and that the devices were used close in time to Furlong's and McDonald's resignations.

142.    On at least four occasions, Furlong used at least four different USB drives on her computer:

- On September 1, 2011, Furlong's HHM laptop was last accessed by a HP v.125w Thumb Drive;

- On September 3, 2011, her HHM laptop was last accessed by a My Passport 0740 Thumb Drive;

- On September 21, 2011, her HHM laptop was last accessed by a Generic USB Flash Memory; and

- On October 3, 2011, her HHM laptop was last accessed by a Western Digital 250GB External Drive.

*See* Affidavit of Louis Cinquanto, EnCe at ¶¶ 16-17.

143.    Importantly, the forensic analysis shows only the last time the devices were plugged into the computer.  Indeed, it is likely that the drives were used on the laptop numerous additional times that are not reflected by the forensic analysis.

144.    The forensic analysis showed a Western Digital 250GB External Drive accessed McDonald's HHM laptop in July 2011.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 33.

145.    Interestingly, this is the exact same Western Digital 250GB External Drive that last accessed Furlong's HHM laptop on October 3, 2011 – several days after Furlong resigned from HHM.

146.    One gigabyte (GB) of data can hold approximately 75,000 pages of data.

147.    Thus, the Western Digital 250GB external drive that accessed both McDonald's HHM laptop and Furlong's HHM laptop could store about 18,750,000 pages of HHM data.

148.    The forensic examination of Furlong's HHM laptop also revealed that Furlong made substantial modifications to her computer on September 20 and September 22, 2011, just days before she announced her departure.

149.    Furlong's actions on her computer, discovered by the forensic examination, underscore her suspect and deceitful behavior.

**McDonald and Furlong try to come "clean" regarding the USB drives but, in doing so, they continue to deceive HHM.**

150.    On October, 7, 2011, after receiving confirmation that memory drives were used on both computers, HHM once again asked McDonald and Furlong if they had any USB or external drives.

151.    In response, McDonald finally admitted having used one flash drive on his computer – "a USB drive shaped like a surfboard." But, he claimed that he "did not believe" that he used other devices.

152.    Similarly, Furlong admitted to having one external hard drive with HHM data on it. This was the Western Digital 250GB external drive referenced above.

153.    Importantly, Furlong did not mention the other USB devices revealed by the forensic investigation, and she claimed that the only other USB devices she used on the computer were a wireless mouse and a Blackberry charger.

154.    After Furlong finally admitted she had the Western Digital 250GB External Drive, HHM demanded the return of this drive.

155.    Upon receiving this request, Furlong claimed she was out of town, and could not return the drive to HHM until Monday, October 10, 2011.

**The forensic examination of the Western Digital 250GB external drive shows that (a) it contains more than 1,300 highly confidential HHM documents and (b) Furlong accessed this drive using an unknown computer on October 5 and October 7, 2011.**

156.    HHM then had a forensic examination completed for the Western Digital 250GB external hard drive.

157.    The forensic analysis revealed that the Western Digital 250GB external drive contained more than 1,300 HHM files that likely were copied from Furlong's HHM laptop.

These files contain an extensive amount of HHM's highly confidential information and trade secrets including:

- detailed financial analyses and revenue projections;

- pricing strategies and analyses;

- existing and future detailed budget information;

- extensive information and analysis regarding HHM's new business opportunities;

- detailed information regarding HHM's special pricing for wholesale and other customers;

- HHM's revenue management tools;

- highly sensitive information regarding compensation and benefits paid to HHM employees; and

- sales presentations and pitch books for key HHM customers.

158.    Unfortunately, this is the exact type of information that HHM would not want to fall into the hands of TPG or any other competitor.

159.    A competitor like TPG could use this information to cause great damage to HHM by, among other things:

- gaining vital insight into HHM's business strategies and operations;

- gaining access to HHM's marketing plans and strategies;

- using HHM's sales information to steal customers from HHM and to identify HHM's most important customers;

- analyzing HHM's current and future budgets to determine how to take advantage of HHM's plans for growth;

- plundering HHM's new business opportunities, which HHM has spent substantial resources to develop; and

- exploiting HHM's highly sensitive and confidential pricing information.

160.    Moreover, the information regarding other employees' compensation specifically could be used by TPG to continue its raiding efforts against HHM.

161.    A comparison of the data from Furlong's HHM computer and the Western Digital 250GB external drive revealed that there were 1,314 instances of data from Furlong's HHM computer on the drive.  When these results were de-duplicated, there were 1,144 unique files from Furlong's HHM computer that existed on the external hard drive.  Many of these files had "HERSHA" in the file name or path.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 29.

162.    When she returned the Western Digital 250GB external drive, Furlong tried to claim that she used this drive for monthly back-ups.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 26.

163.    But, the forensic examination contradicts this claim.  Specifically, there are several thousand more HHM files on Furlong's drive than the number of HHM files on Furlong's HHM laptop.  If Furlong was truly using the Western Digital external drive for merely backing up her HHM laptop, this external drive would have many more files on it that match the ones on her HHM laptop.  Furlong's use of this drive is consistent with file usage, not file back-up.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 32.

164.    This forensic examination also revealed that on October 3, 2011, some documents were accessed in "machine gun" fashion which, from a forensic standpoint, is indicative of copying multiple files at once.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 22.

165.    Furthermore, on October 3, 2011, Furlong remotely logged onto HHM's network and accessed numerous files, and then, only seconds later, connected this external hard drive.  This behavior is indicative of attempts to copy data.  *See* Affidavit of Louis Cinquanto, EnCe at ¶¶ 23-24.

166.    After October 5, 2011, more than 47 folders and files were accessed on the hard drive by a non-HHM computer. These files could not have been accessed on Furlong's HHM computer, because Furlong returned her computer to HHM on October 4, 2011. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 30.

167.    The forensic investigation revealed additional use of the external drive after Furlong returned her HHM computer. *See generally* Affidavit of Louis Cinquanto, EnCe.

168.    On October 7, 2011, a folder on the hard drive called "HERSHA" was accessed. This folder contains more than 10,854 different types of files and subfolders, and 11,390 instances of the word "HERSHA" in the metadata and documents' content. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 31.

169.    The accessing of these folders is troubling because of the vast amounts of confidential information they contain. One reason to access the files would be, of course, to copy them onto an unknown, target computer. The only way to determine if these files have not actually been surreptitiously copied is to access this unknown, target computer.

170.    Furlong and McDonald have breached their duties of loyalty to HHM by engaging in action inimical to HHM's interests while in its employ, and have misappropriated HHM's trade secrets and confidential information.

171.    Furlong and McDonald have breached the non-solicitation and confidentiality clauses in their employment agreements.

**HHM's forensic analyses of Singer's computer shows extensive external drive and "cloud-based" service use under suspicious circumstances.**

172.    HHM policy expressly prohibits the use of external devices to store or access any HHM information.

173.    At his exit interview on October 4, 2011, Singer admitted to having used one external drive on his HHM computer. In and of itself, this use was in violation of HHM's

established policy. HHM's forensic analysis of Singer's HHM computer, however, reveals much more extensive use of external drives, all of which also violated HHM policy.

174.    At least five different external memory devices were used on the laptop:

- On October 7, 2011, Singer's HHM laptop was last accessed by a SanDisk Cruzer;

- On October 7, 2011, Singer's HHM laptop was last accessed by a WD 1600BEV External Drive;

- On September 22, 2011, Singer's HHM laptop was last accessed by a SanDisk U3 Cruzer Micro;

- On September 17, 2011, Singer's HHM laptop was last accessed by a WD Prod 2500BMV Extern Hard Drive; and

- On September 6, 2011, Singer's HHM laptop was last accessed by a USB Flash Disk (Generic).

*See* Affidavit of Louis Cinquanto, EnCe at ¶¶ 39-40.

175.    These devices all were utilized over a condensed two-month period immediately preceding and following Singer's resignation from HHM. The usage of multiple devices in a condensed time frame is consistent with shuttling data between multiple computers.

176.    These drives, both individually and collectively, have enormous storage capacity.

177.    At the time he resigned, Singer turned over the SanDisk Cruzer, last accessed on October 7, 2011. The examination of this device revealed that the majority of files on the device were deleted or overwritten. The last access times indicate the deletions most likely occurred between May 20, 2011 and October 7, 2011, after Singer resigned from HHM. Between early August 2011 and October 7, 2011, approximately 700 files were deleted off of the drive. In addition, the forensic examination of this drive showed multiple overwritten files with "TPG" in the name, casting doubt about Singer's loyalty to HHM while still employed. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 42.

178.    The WD 1600BEV Extern Drive was last accessed by Singer's HHM laptop on

October 7, 2011, after Singer resigned from HHM and agreed to work for TPG.  *See* Affidavit of

Louis Cinquanto, EnCe at ¶ 43.  Suspiciously, this drive first was installed on September 17,

2011, only a few days before Singer received his official offer of employment from TPG.  Also

on September 17, 2011, Singer's HHM computer was accessed by the Western Digital Hard

Drive.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 43.  These two drives were inserted into the

computer only four seconds apart.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 43.  The forensic

examination of Singer's computer showed extensive "machine-gun" access of what appear to be

HHM spreadsheets on both of these devices.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 44.

179.    The SanDisk U3 Cruzer accessed files with "rm" in the file name.  Upon

information and belief, "rm" in the file name correlates with the phrase "revenue management."

Additionally, on this drive, there is evidence that files were opened and accessed, and possibly

copied onto Singer's HHM laptop, within a few minutes of the drive being plugged into the

computer.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 46.

180.    Information about the final device, the generic drive, cannot be deduced without a

forensic examination of the device.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 48.

181.    Without access to all of the aforementioned drives, especially the WD 1600BEV

External Drive, HHM cannot determine precisely how much of HHM's confidential or

proprietary information the devices store.

182.    In addition, the forensic analysis of Singer's computer also revealed use of a

cloud-like program called Drop-Box.  Drop-Box works like an external hard drive, but does not

require any actual device and items saved in Drop-Box can be accessed remotely from any

computer at any time using the internet.  *See* Affidavit of Louis Cinquanto, EnCe at ¶ 50.

183.    Upon information and belief, HHM's confidential and proprietary information is stored on Singer's Drop-Box account.

184.    Preliminary analysis indicates there are 1,170 files and folders in Singer's Drop-Box account, which he utilized Drop-Box as late as October 7, 2011, his last day at HHM. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 50.

185.    Singer deliberately and purposefully copied his HHM e-mails to his Drop-Box account, all of which he still can access, through the use of a Personal Storage file ("PST file") named "davidsinger.pst." *See* Affidavit of Louis Cinquanto, EnCe at ¶ 50.  PST files are used to store, send, and receive email messages, and to copy messages, calendar events, documents and other items within Microsoft Outlook, which Singer used as his e-mail software while at HHM. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 50.  In this PST file, there are over 9,200 emails and attachments, both to and from Singer, which total approximately 1.4 GB of data. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 51.  Many of these attachments contain HHM's confidential and proprietary information. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 51.

**When approached by HHM about the forensic results,
Singer responded with dubious explanations.**

186.    On October 24, 2011, counsel for HHM sent Singer a letter detailing the findings of HHM's forensic examination and offering him an opportunity to return the devices to HHM.

187.    Singer did not return to HHM any of the aforementioned devices accessed by his HHM laptop.

188.    Singer did respond to HHM's letter with his own letter dated October 28, 2011. The letter stated that with the exception of the WD 1600BEV External Drive, the other drives belonged to HHM associates who plugged their devices into his laptop "in the ordinary course of business to transfer files which were too large to email." Singer also noted that he "frequently" exchanged files with HHM's Regional Director of Sales and Marketing.

189.    According to Singer, the WD 1600BEV External Drive is a "personal drive" that does not contain HHM's information.  In his response, Singer stated, "I would be willing to consider some method of examination by an independent third party for a specific purpose, but I am not willing to have the hard drive imaged, mirrored or the files downloaded."

190.    The truth of Singer's response is questionable since HHM has not been able to confirm that employees used their own drives on Singer's computer.  In addition, the employee whom it is believed Singer is referring to in his letter has denied using her own external device on his computer.

### HHM's forensic analysis of Swerdloff's computer shows extensive access of HHM's documents on external drives.

191.    When Swerdloff resigned from HHM he vehemently denied ever having downloaded or accessed files HHM files on an external device.

192.    After Swerdloff left HHM, HHM conducted a forensic analysis of his HHM laptop.  The results of this forensic examination are extremely troubling and cast doubt on Swerdloff's assurances, especially in light of the fact that HHM prohibits its employees from storing or accessing HHM information on external devices.

193.    Two external drives were accessed by Swerdloff's computer:  (1) Hitachi 160GB hard drive, last accessed on October 5, 2011; and (2) SkyMedi device, also known as a Kingston Data Traveler, last accessed on August 19, 2011.  *See* Affidavit of Louis Cinquanto, EnCe at ¶¶ 58-60.

194.    Swerdloff's user profile on his HHM laptop had 68 "links" to files that recently were opened from the Hitachi device.  *See* Affidavit of Louis Cinquanto, EnCe at ¶¶ 62, 64. While the investigation is continuing, it is clear that this drive has extensive, highly confidential HHM information including:  pricing spreadsheets; pricing models; sales and marketing plans; action plans; and other keys metrics.  Among these files is a document entitled "Top 25 Hotel

Accounts thru 9.14.11.xls." Multiple other files contain confidential information about the operations of specific HHM managed hotels, including "GRC" files, which have information about tentative and definite group business at a given hotel. These files are recognized by HHM as containing confidential information.

195. In addition, computer back-up software, capable of copying a mirror image of a computer, also was installed on the Hitachi device. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 64. The folder structure on the Hitachi device also is consistent with use as a back-up drive. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 64. However, the back-up software was not installed on Swerdloff's HHM computer. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 64. Upon information and belief, this drive was used to back-up another computer that contained substantial amounts of HHM's work-product. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 64. Based on the pattern of file access on this drive, it is also clear that the drive was being used to transfer information from Swerdloff's HHM laptop to another, unknown computer. *See* Affidavit of Louis Cinquanto, EnCe at ¶ 64.

196. Defendants engaged in unfair competition with HHM and tortiously interfered with HHM's business and contractual relations for improper motives and with improper means.

197. Upon information and belief, Defendants have converted HHM's proprietary, confidential, and trade secret information.

198. Upon information and belief, all Defendants conspired together to engage in unlawful acts and achieve unlawful means, all as alleged above.

199. Defendants' actions have been willful, malicious, and outrageous and undertaken with reckless indifference to the rights of HHM.

## COUNT I

### INJUNCTIVE RELIEF
**(Against All Defendants)**

200.    HHM repeats and realleges the allegations of paragraphs 1 through 199 of this Complaint as if fully set forth herein

201.    As alleged above, Defendants' conduct violates the McDonald Agreement and the Furlong Agreement; and constitutes misappropriation of trade secrets under the Pennsylvania Uniform Trade Secrets Act, misappropriation of confidential information in violation of Pennsylvania common law, breach of fiduciary duty, conspiracy, tortious interference, and conversion.

202.    By virtue of the foregoing, HHM has demonstrated a likelihood of success on the merits and that the balancing of the equities favors the issuance of an injunction against Defendants.

203.    Unless Defendants are temporarily restrained and/or preliminarily and permanently enjoined from breaching the McDonald and Furlong Agreements, from interfering with HHM's employment and business relationships and from using and disclosing the confidential information and trade secrets that were taken from HHM, HHM will be immediately and irreparably harmed by the:

A.    Disclosure of HHM's confidential, proprietary information and trade secrets, including all confidential information and trade secrets that the Individual Defendants had access to as a result of their employment with HHM;

B.    Loss of goodwill and business reputation in the hotel management industry;

C.    Loss of existing clients, prospective clients, existing employees, and prospective employees;

D.   Loss of potential business that the Individual Defendants were responsible for immediately before they resigned;

E.   Loss of business that the Individual Defendants are diverting to TPG; and

F.   Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

G.   Moreover, unless Defendants are ordered to relinquish immediately to the Court for inspection by HHM (or its designated representative) all portable memory devices, including flash drives, USB drives and external hard drives that the Individual Defendants had access to during their employment at HHM, including any portable memory devices or computers issued to them by TPG, HHM will be immediately and irreparably harmed by:

1.   the potential destruction of all evidence, including electronic indicia, which could be used to determine to whom Defendants potentially disclosed the confidential information and trade secrets that they may have stolen, retained and/or transferred to TPG;

2.   the continued misappropriation of HHM's confidential information and trade secrets; and

3.   the potential destruction of the subject electronic media that could have been used to store HHM's confidential information and trade secrets.

204.    The losses suffered by HHM as the result of Defendants' conduct cannot be fully or adequately compensated in money damages, and HHM does not have an adequate remedy at law.

205.    Greater injury will be inflicted upon HHM by the denial of the injunctive relief than would be inflicted upon the Defendants by the granting of such relief.  The public will benefit by the issuance of the Injunctive Order requested by HHM in this matter.

## COUNT II

## BREACH OF CONTRACT
### (Against All Individual Defendants)

206.    HHM repeats and realleges the allegations of paragraphs 1 through 205 of this Complaint as if fully set forth herein.

207.    As part of the McDonald Agreement, McDonald entered into a confidentiality agreement with HHM.

208.    As part of the Furlong Agreement, Furlong entered into a confidentiality agreement with HHM.

209.    As part of the Singer Agreement, Singer entered into a confidentiality agreement with HHM.

210.    As part of the Swerdloff Agreement, Swerdloff entered into a confidentiality agreement with HHM.

211.    The McDonald Agreement, the Furlong Agreement, the Singer Agreement, and the Swerdloff Agreement are valid and binding contracts supported by consideration.

212.    Upon information and belief, Furlong, McDonald, Singer, and Swerdloff breached and continue to breach the express terms of their respective confidentiality agreements by using and/or disclosing HHM's confidential information beyond the limitations set forth in

the confidentiality agreements and by failing return all of HHM's proprietary, confidential, and trade secret information.

213.    As part of the McDonald Agreement, McDonald entered into a non-solicitation agreement with HHM.

214.    As part of the Furlong Agreement, Furlong entered into a non-solicitation agreement with HHM.

215.    Furlong and McDonald breached the express terms of their respective non-solicitation agreements by soliciting, encouraging, and/or persuading HHM's employees to join TPG.

216.    As a direct and proximate result of Furlong's and McDonald's breach of the confidentiality agreements and non-solicitation agreements, and as a direct and proximate result of Singer's and Swerdloff's breach of their respective confidentiality agreements, HHM has sustained substantial damages.

217.    Further, by reason of Furlong's, McDonald's, Singer's, and Swerdloff's use and/or disclosure of HHM's confidential information, HHM has sustained and, if the Individual Defendants' acts are not immediately and permanently enjoined, will continue to sustain irreparable harm for which no adequate remedy at law exists.

218.    The Individual Defendants' actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights of HHM.

## COUNT III

## MISAPPROPRIATION UNDER PENNSYLVANIA'S TRADE SECRET ACT, 12 Pa. Cons. Stat. § 5301, *et. seq.*
### (Against All Individual Defendants)

219.    HHM repeats and realleges the allegations of paragraphs 1 through 218 of this Complaint as if fully set forth herein.

220.    Upon information and belief, Defendants have misappropriated HHM's trade secrets and confidential information without the express or implied consent of HHM.

221.    Furlong, while employed by HHM, accessed and downloaded from her work computer thousands of highly confidential files, many of which are trade secrets under Pennsylvania's Trade Secret Act, 12 Pa. Cons. Stat. § 5301, *et seq.*

222.    Despite his denials, McDonald's HHM laptop was accessed by an external hard drive in July 2011. This drive contains thousands of HHM documents (including highly confidential information and trade secrets). The drive also was accessed (in October 2011) on Furlong's HHM laptop.

223.    Moreover, the forensic examination conclusively proves that at least three other USB memory devices were used on Furlong's HHM laptop in September 2011. Furlong, however, denied the existence of these devices. Her denials are not credible.

224.    Upon information and belief, these three "missing" USB devices contain HHM's highly confidential information and trade secrets.

225.    Both immediately before and immediately after his resignation from HHM, Singer's HHM laptop was accessed by at least five external devices. Data on these drives was copied in a "machine-gun" fashion, indicative of multiple files being copied from the laptop to the drive simultaneously. The forensic examination revealed other behavior that is consistent with large quantity file copying, behavior that is highly suspicious and very concerning.

226.    And, while Swerdloff still worked for HHM, his computer was accessed by an external drive with software that can be used to back-up an entire computer system. Based on the forensic examination, it is clear that this external drive contained some of HHM's most proprietary and confidential information.

227.    HHM's confidential information, described throughout this Complaint, constitute trade secrets that are not known in the industry, and provide HHM with an advantage over competitors who do not know the confidential information.  Therefore, this information has independent value from not being generally known.

228.    The Individual Defendants also have knowledge of HHM's budgets, revenue projections, marketing strategies, existing and prospective customers, pricing, programs, new program developments, budgets and forecasts, new business pursuits, revenue management tools, sales tracking tools, sales generation tools, and numerous other types of competitive information that are highly confidential and constitute trade secrets.  Upon information and belief, the Individual Defendants have used or disclosed, or are likely to use or disclose, this information in the performance of their duties for TPG.

229.    Upon information and belief, because the Individual Defendants had access to and have taken HHM's trade secrets, and because, upon information and belief, TPG has used or allowed the use of HHM's trade secrets, it is also inevitable that TPG and the persons acting in concert with TPG will use and disclose such secrets when working on behalf of TPG's competing hospitality management business.

230.    HHM has expended substantial resources in developing its trade secrets and confidential information for its exclusive benefit.

231.    HHM's trade secrets and confidential information derive economic value from the fact they neither are generally known nor readily ascertainable by proper means of any third parties.

232.    HHM does not disclose its trade secrets or confidential information to its competitors and has made reasonable efforts to protect their confidentiality, including the use of confidentiality agreements and identifying information as confidential.

233.    HHM communicated its trade secrets and confidential information to the Individual Defendants in confidence, and the Individual Defendants knew that HHM intended for its trade secrets and confidential information to remain confidential.

234.    The Individual Defendants had a duty to maintain such confidential information in confidence and to use the information only for the limited purpose of carrying out their job responsibilities with HHM.

235.    All Defendants have a duty not to use HHM's confidential information and a duty not to allow their agents or employees to use HHM's confidential information.

236.    Defendants have been unjustly enriched by the misappropriation of HHM's trade secrets.

237.    Upon information and belief, the Individual Defendants have willfully, maliciously, and in bad faith used and/or disclosed HHM's trade secrets in violation of Pennsylvania's Trade Secret Act, 12 Pa. Cons. Stat. § 5301, *et seq*, thereby evincing a reckless indifference to HHM's rights.

238.    HHM's trade secret information, including, but not limited to, that information referenced above, is of a special, unique, ordinary, and intellectual character, giving it special and unique value, the loss of which may not be reasonably or adequately compensated in damages.

239.    By reason of Defendants' conduct, HHM has sustained and, if Defendants are not enjoined, will continue to sustain substantial damages the precise amount of which will be determined at trial.

240.    Further, Defendants' use and disclosure of HHM's confidential information and other trade secrets have caused and will continue to cause HHM irreparable harm for which no adequate remedy at law exists.

## COUNT IV

## BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY
### (Against All Individual Defendants)

241.    HHM repeats and realleges the allegations of paragraphs 1 through 240 of this Complaint as if fully set forth herein.

242.    HHM authorized Furlong to act as its agent in her capacity as its Vice President of Revenue Management.

243.    HHM authorized McDonald to act as its agent in his capacity as Executive Vice President of Sales and Marketing.

244.    HHM similarly authorized Singer and Swerdloff to act as its agents in their roles as Directors.

245.    As agents of HHM, the Individual Defendants owed HHM fiduciary duties, including a duty of loyalty.

246.    The Individual Defendants, through their actions as set forth herein, intentionally and willfully violated their fiduciary duties to HHM by taking actions against HHM's interest while still employed by HHM.  These actions include, but are not limited to:  (a) soliciting HHM's employees and diverting such employees away from employment with HHM; (b) seizing for their own personal gain confidential information and trade secrets which are essential to HHM's business strategy and overall success, and sharing said information with their new employer TPG; and (c) simultaneously conducting business for TPG and HHM, on HHM's own network servers, while still employed by and being compensated by HHM.

247.    By and through their above actions, the Individual Defendants have breached their fiduciary duties owed to HHM.

248.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, HHM has suffered substantial damages.

249.    Defendants' actions have been willful, malicious, and outrageous and undertaken with reckless indifference to the rights of HHM.

## COUNT V

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Against TPG)**

250.    HHM repeats and realleges the allegations of paragraphs 1 through 249 of this Complaint as if fully set forth herein.

251.    Upon information and belief, TPG knowingly aided and abetted McDonald's and Furlong's efforts to breach their fiduciary duties by acting as a facilitator of, and co-conspirator in, the actions described herein.

252.    Upon information and belief, TPG provided McDonald and Furlong substantial assistance in breaching their fiduciary duties to HHM.

253.    As a direct and proximate result of TPG's acts, HHM has suffered substantial damages.

254.    TPG's actions have been willful, outrageous, and undertaken with reckless indifference to the rights of HHM.

## COUNT VI

### TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL AND PROSPECTIVE BUSINESS ADVANTAGE
**(Against All Defendants)**

255.    HHM repeats and realleges the allegations of paragraphs 1 through 254 of this Complaint as if fully set forth herein.

256.    As described above, HHM has developed trade secrets and confidential information, and this information provides HHM with an advantage over its competitors.

257.    HHM had a reasonable expectation of economic advantage that has been lost as a result of Defendants' improper and malicious interference through their misappropriation of HHM's confidential information and trade secrets.

258.    Further, HHM has spent considerable time and resources developing and hiring employees, like the Individual Defendants.  The employment of individuals, like Furlong, McDonald, Singer, Swerdloff, gives HHM an advantage over its competitors.

259.    Further, HHM has spent considerable time and resources developing and maintaining its relationships with existing and prospective customers.

260.    HHM has a reasonable expectation of continued business relations with its existing employees and existing and prospective customers.  Defendants wrongfully, tortiously, and without privilege interfered with such relationships by willfully conspiring to lure away employees from HHM in violation of existing contractual obligations and well-established fiduciary duties, all of which were with the purpose or intent to harm HHM.

261.    By tortiously interfering with HHM's existing employees and existing and prospective customers, Defendants have caused and will continue to cause HHM actual, immediate, and irreparable harm for which HHM has no adequate remedy at law.

262.    By tortiously interfering with HHM's existing employees and existing and prospective customers, Defendants have acted intentionally, willfully, maliciously, and with reckless indifference to HHM's rights.

263.    Defendants will continue such wrongful conduct unless immediately and permanently enjoined.

264.    As a direct and proximate result of Defendants' interference, HHM has suffered substantial damages, for which Defendants are liable.

265.    Defendants' actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights of HHM.

## COUNT VII

### CONSPIRACY
**(Against All Defendants)**

266.    HHM repeats and realleges the allegations of paragraphs 1 through 265 of this Complaint as if fully set forth herein.

267.    Upon information and belief, Defendants combined and acted with a common plan and purpose to illegally solicit, recruit, and hire away HHM's employees.

268.    Upon information and belief, Defendants combined and acted with a common plan and purpose to misappropriate HHM's confidential information, trade secrets, and other property by engaging in the unlawful acts described above.

269.    Upon information and belief, Defendants committed overt acts, as described above, including, but not limited to, the unauthorized downloading and taking of trade secrets and confidential information, and competing against HHM while the Individual Defendants were still employees, all in pursuit of the common purpose described above.

270.    As a direct and proximate result of the acts done in furtherance of the conspiracy, HHM has been damaged, including damages to HHM's overall business and operations, and damage in the form of expenses related to investigative and remedial actions taken to address the effects of the conspiracy.  HHM has suffered, and will continue to suffer, these injuries.

271.    As a direct and proximate result of Defendants' conspiracy, HHM has suffered substantial damages.

272.    Defendants' actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights of HHM.

## COUNT VIII

## UNJUST ENRICHMENT
### (Against All Defendants)

273.    HHM repeats and realleges the allegations of paragraphs 1 through 272 of this Complaint as if fully set forth herein.

274.    By utilizing HHM's confidential proprietary information and trade secrets, Defendants secured advantages and benefits from information to which they were not entitled.

275.    Upon information and belief, Defendants currently remain in possession of this information.

276.    Defendants have no entitlement to any information that they have taken, retained, and/or received from HHM.

277.    The taking and securing of this information has been, and will continue to be, detrimental to HHM's current and future business prospects.

278.    Upon information and belief, Defendants have continued to use the ill-gotten property for their own benefit.

279.    Through these actions, Defendants have benefitted from the use of HHM's information for which they paid no consideration.

280.    Further, by conspiring to improperly solicit, recruit, and lure away key employees from HHM, Defendants have secured advantages and benefits from these individuals to which they were not entitled.

281.    Defendants have continued to benefit from employing these individuals.

282.    The conduct described above is both inequitable and unjust.

283.    As a direct and proximate result of Defendants' unjust enrichment, HHM has suffered substantial damages.

284.    Defendants' actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights HHM.

## COUNT IX

## CONVERSION
### (Against All Defendants)

285.    HHM repeats and realleges the allegations of paragraphs 1 through 284 of this Complaint as if fully set forth herein.

286.    HHM retained all rights, titles, and interest in the trade secrets and other information and property taken by Defendants.

287.    By taking HHM's documents and information, Defendants deprived HHM of the use of this information, without HHM's consent, and without lawful justification.

288.    As a direct and proximate result of Defendants' illegal conversion, HHM has suffered substantial damages.

289.    Defendants' actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights of HHM.

## COUNT X

## UNFAIR COMPETITION
### (Against All Defendants)

290.    HHM repeats and realleges the allegations of paragraphs 1 through 289 of this Complaint as if fully set forth herein.

291.    By illegally soliciting and hiring HHM's employees and misappropriating HHM's trade secrets and confidential information, Defendants have intentionally interfered with HHM's ability to fairly compete with TPG.

292.    Moreover, TPG has hired HHM's employees not because they are particularly gifted or skilled, but because they want to injure HHM and to induce HHM's employees to

improperly disclose HHM's confidential information and trade secrets and to misappropriate the client relationships these employees developed while employed at HHM.

293.    Upon information and belief, TPG offered substantial increases in compensation to the former HHM employees and hired them for the sole purpose of injuring HHM.

294.    Upon information and belief, TPG offered substantial increases in compensation to the former HHM employees and hired them for the sole purpose of inducing them to commit wrongs.

295.    Upon information and belief, Defendants have committed these acts maliciously and for the sole purpose of inflicting harm on HHM or to benefit themselves at HHM's expense.

296.    As a direct and proximate result of Defendants' unfair competition, HHM has suffered damages.

297.    Defendants' actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights of HHM.

## COUNT XI

### COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030
(Against Furlong, Singer, and Swerdloff)

298.    HHM repeats and realleges the allegations of paragraphs 1 through 297 of this Complaint as if fully set forth herein.

299.    Furlong, Singer, and Swerdloff intentionally exceeded the authorized access of their HHM computers, and in doing so, obtained vast quantities of HHM's confidential information. In addition, these individuals acted with the intent to defraud and deceive HHM when they exceed their authorized access. Their conduct furthered the intended fraud, and they obtained HHM's valuable trade secrets through it. Finally, in accessing HHM's computers in the manners they did, Furlong, Singer, and Swerdloff caused significant damage and loss to HHM.

Alternatively, Furlong, Singer, and Swerdloff lacked authorization when they accessed HHM's computers to, *inter alia*, misappropriate them for the benefit of themselves and TPG.

300.    HHM's policies make it clear that employees shall not copy HHM's information onto external storage media, like a flash drive or external drive. Furlong, Singer, and Swerdloff each violated this policy.

301.    In September 2011 (and perhaps much earlier), Furlong, knowingly and with intent to defraud, accessed HHM's protected computer network and files maintained on her HHM laptop – and by means of such conduct, defrauded HHM and obtained for herself information of substantial value.

302.    Upon information and belief, at the time Furlong accessed and downloaded HHM's critical information, Furlong already had accepted an offer with TPG and surreptitiously started competing against HHM.

303.    Upon information and belief, Furlong's unauthorized access continued until she formally resigned her employment from HHM and continued after she left HHM.

304.    Furlong's downloading of massive quantities of HHM's confidential information and trade secrets for no legitimate purpose was in excess of her authorized access to HHM's computer network system.

305.    Furlong accessed and copied more than 1,000 HHM computer files and records in excess of her authority from HHM.

306.    Upon information and belief, Singer copied extensive amounts of HHM's information in a machine-gun fashion onto the five external drives used on his computer.

307.    Singer deliberately and purposefully copied his HHM materials, including e-mails, to his Drop-Box account. There are in excess of 9,200 emails and attachments both to and from Singer. Many of these attachments contain HHM's confidential and proprietary

information.  HHM's computer system had its own automatic back-up, which would eliminate the need for any employee to "back-up" his or her files separately, suggesting Singer's actions had nefarious purposes.

308.    Singer continued to utilize Drop-Box to download HHM's confidential and proprietary information even after he resigned from HHM.

309.    When Swerdloff resigned from HHM he deceived the company by denying having downloaded or accessed HHM files on any external device; Swerdloff's computer had been accessed by at least two external devices.

310.    One of the devices utilized on Swerdloff's computer had back-up software installed that would enable a user to make a mirror copy of any computer.

311.    Swerdloff's HHM laptop also had 68 "links" to HHM's highly confidential information including:  pricing spreadsheets; pricing models; sales and marketing plans; action plans; and other keys metrics.  These links suggest that these files have been downloaded to an unknown computer.

312.    All computers HHM supplies to its employees are configured for internet use.

313.    HHM's business involves interstate commerce and communication.  In their roles while at HHM, Furlong, Singer, and Swerdloff utilized computers to affect interstate commerce and to communicate across interstate lines.  These former employees also traveled extensively, with their computers in tow, and communicated with clients located throughout the country on a daily basis.

314.    HHM has incurred substantial costs well in excess of $5,000 in its investigation and response to Furlong's, Singer's, and Swerdloff's conduct.

315.    As a direct and proximate result of this unauthorized copying, diverting, misappropriating, using, and/or gaining access to HHM's computer equipment, documents and

information, including trade secrets and confidential information, through the fraudulent and unauthorized access of protected computers, and by causing losses and damages to HHM in excess of $5,000, Furlong, Singer, and Swerdloff have violated the Computer Fraud and Abuse Act and harmed HHM.

316.    As a direct and proximate result of Furlong's, Singer's, and Swerdloff's violations of the Computer Fraud and Abuse Act, and continued unlawful use of the documents and information taken from HHM, HHM will continue to suffer irreparable harm.

317.    Furlong's, Singer's, and Swerdloff's actions have been willful, malicious, outrageous, and undertaken with reckless indifference to the rights of HHM.

### REQUEST FOR JURY TRIAL

HHM demands a trial by jury as to all claims that may be tried to a jury.

### PRAYER FOR RELIEF

WHEREFORE, HHM respectfully requests the following relief:

A.    Temporary, preliminary, and permanent injunction requiring Defendants and/or any persons or entities acting in concert with them:

1.    To immediately return all materials, including those in electronic format, that any of the Defendants took from HHM or otherwise improperly received from HHM.

2.    To immediately return all of HHM's confidential information and trade secrets, including but not limited to:  information regarding pricing; customer contacts and development; marketing strategies; financial analyses and projections; new program initiatives; past, present, and/or

future budgets; past, present, and/or future revenue projections and programs, customer histories; new customer opportunities; sales presentations and pitch books; HHM employee compensation and personnel information; and potential customer and lead information.

3. To immediately preserve all electronic information, including all data stored in electronic form on a computer-based system, that is in the possession, custody, and/or control of any of the Defendants.

4. To immediately take all other measures necessary to ensure that no electronically stored data potentially relating to this matter in any of the Defendants' possessions, custodies and/or controls are erased, deleted, or otherwise destroyed.

5. To immediately cease engaging in any conduct which directly or indirectly interferes, hinders, obstructs, or impedes HHM's actual or prospective business relationships with its employees, existing clients, and prospective clients.

6. To immediately cease recruiting, soliciting, inducing, attempting to induce away, and/or contacting any HHM employee for the purpose of potentially employing them at TPG.

7. To, with regard to McDonald, immediately comply with all obligations set forth in the Employment Agreement between McDonald and HHM dated October 4, 2010.

8.    To, with regard to Furlong, immediately comply with all obligations set forth in the Confidentiality, Non-Solicitation, and Non-Piracy Agreement between her and HHM dated November 11, 2010.

9.    To, with regard to Singer, immediately comply with all obligations set forth in the Confidentiality, Non-Solicitation, and Non-Piracy Agreement between him and HHM dated June 30, 2011.

10.    To, with regard to Swerdloff, immediately comply with all obligations set forth in the Confidentiality, Non-Solicitation, and Non-Piracy Agreement between him and HHM dated May 27, 2011.

11.    To immediately relinquish to the Court, for inspection by HHM's designated representative:

(i)    all portable memory devices, including flash drives, USB drives, and external had drives that McDonald had access to during his employment at HHM, including any portable memory devices and/or computers issued to him by TPG;

(ii)    all portable memory devices, including flash drives, USB drives, and external had drives that Furlong had access to during her employment at HHM, including any portable memory devices and/or computers issued to her by TPG;

(iii)    all portable memory devices, including flash drives, USB drives, and external had drives that Singer had access to during his

employment at HHM, including any portable memory devices and/or computers issued to him by TPG;

(iv)    all portable memory devices, including flash drives, USB drives, and external had drives that Swerdloff had access to during his employment at HHM, including any portable memory devices and/or computers issued to him by TPG;

(v)    all floppy disks, CDs, computers, USB drives, flash drives, external hard drives, and/or other computer memory storage media that – at anytime – stored any information that Defendants received, retained, and/or took from HHM; and

(vi)    all computers that TPG issued to the Individual Defendants.

12.    To immediately provide user names and passwords for any web-based or internet cloud-based services that Defendants have used to store and/or access any of HHM's proprietary, confidential, and/or trade secret information.

13.    To immediately cease using or disclosing any materials (including computer readable media) in the Defendants' possession, custody, or control (including any officer, agent, employee, and/or representative of Defendants), which contain any of HHM's proprietary and confidential information and/or trade secrets.

14.     To immediately cease doing business, until further Order of this Court, with HHM's existing or prior customers that are identified in any of the proprietary and confidential information and trade secrets that Defendants McDonald, Furlong, Singer, and/or Swerdloff took and/or retained in connection with their employment with HHM.

15.     To immediately cease doing business, until further Order of this Court, with HHM's clients for which TPG did not do any actual business before the Individual Defendants accepted employment offers from TPG.

B.     Actual, compensatory, and punitive damages in an amount exceeding $75,000, with a precise figure to be determined at trial;

C.     Prejudgment and post-judgment interest;

D.     HHM's reasonable attorney fees, expert fees, and costs incurred in this matter, pursuant to 12 Pa. Cons. Stat. § 5305, Pennsylvania's Uniform Trade Secrets Act; and,

E.     Any other relief this Court deems necessary, just, and proper.

Respectfully submitted,

COZEN O'CONNOR

By: _____
David J. Walton (ID #86019)
Rachel S. Fendell (ID #308751)
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000
Attorneys for Plaintiff
Hersha Hospitality Management

Dated: October 31, 2011

## CERTIFICATE OF SERVICE

I certify that the First Amended Complaint was served via email and/or First Class Mail addressed to:

Rodney A. Harrison, Esquire
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
7700 Bonhomme Ave., Ste. 650
Saint Louis, MO 63105
rodney.harrison@ogletreedeakins.com

Attorneys for Defendants

*Rachel S Fendell*
Rachel S. Fendell

Dated: October, 31, 2011